**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x

AJ RUIZ CONSULTORIA EMPRESARIAL S.A.,                    :
solely as Judicial Administrator and foreign representative   :
of SCHAHIN HOLDING S/A, *et al.*,                          :

                                                           :

                    Plaintiff,                       :      Adv. Case No. 21-01213 (LGB)

                                                           :

v.                                                              :

BANCO BILBAO VIZCAYA ARGENTARIA, S.A.,          :
*et al.*,                                                      :

                                                           :

                    Defendants.                    :

------------------------------------------------------------------------x

AJ RUIZ CONSULTORIA EMPRESARIAL S.A.,                    :
solely as Judicial Administrator and foreign representative   :
of SCHAHIN HOLDING S/A, *et al.*,                          :

                                                           :

                    Plaintiff,                       :

                                                           :      Adv. Case No. 21-01216 (LGB)

v.                                                              :

BANK OF CHINA LIMITED, *et al.*,                          :

                                                           :

                    Defendants.                    :

------------------------------------------------------------------------x

<u>**OPINION & ORDER**</u>

<u>**APPEARANCES**</u>

JONES DAY LLP
*Attorneys for IFC*
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
By:    Kevyn D. Orr

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.
*Attorneys for the Plaintiff*
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
By:    Andrew E. Goldsmith
       Derek T. Ho

DORSEY & WHITNEY, LLP
*Attorneys for Bank of China Limited; China Development Bank*
51 West 52nd Street
New York, NY 10019
By:    Lanier Saperstein

LAW OFFICE OF STEVEN J. FINK PLLC
*Attorneys for Portigon AG, New York Branch*
100 Wall Street, 15th Floor
New York, NY 10005
By:    Steven J. Fink

SIDLEY AUSTIN LLP
*Attorneys for IFC*
1501 K Street, N.W.
Washington, D.C. 20005
By:    Jeffrey T. Green

SULLIVAN & CROMWELL LLP
*Attorneys for Nomura Corporate Funding Americas, LLC*
1700 New York Avenue, N.W., Suite 700
Washington, D.C. 20006
By:    Amanda F. Davidoff

MILBANK LLP
*Attorneys for the Banco Bilbao Vizcaya Argentaria, S.A.;*
*Banco Bilbao Vizcaya Argentaria, S.A., Grand Cayman Branch;*
*Caterpillar Financial Services Corporation; Credit Industriel et*
*Commercial; Deutsche Bank AG, London Branch; Deutsche Bank*
*Trust Company Americas; Dexia Credit Local SA; Dexia Credit Local SA,*
*New York Branch; Hamburg Commercial Bank AG; Intesa Sanpaolo, S.p.A.,*
*New York Branch; Itau BBA International PLC; KfW; Mizuho Bank, Ltd.;*
*Shinhan Bank; Standard Chartered Bank; UniCredit Bank AG*
55 Hudson Yards
New York, NY 10001

By:    Alexander B. Lees
       Daniel M. Perry
       Joseph M. DaSilva

MAYER BROWN LLP
*Attorneys for Mitsubishi Corporation; MS Drillship I S.A.*
1221 Avenue of the Americas
New York, NY 10020
By:    Christopher J. Houpt
       Matthew Ingber

MASUDA, FUNAI, EIFERT & MITCHELL, LTD.
*Attorneys for Mitsubishi UFJ Lease & Finance (U.S.A.) Inc.*
203 North LaSalle Street, Suite 2500
Chicago, IL 60601
By:    Jiwon Juliana Yhee

**HON. LISA G. BECKERMAN**

**UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court are two Motions to Dismiss regarding the Amended Complaints in these adversary proceedings.  The Amended Complaints allege claims of unjust enrichment and aiding and abetting breach of fiduciary duty.  The Defendants seek dismissal under several Rule 12(b) motions, including dismissal on the grounds of sovereign immunity, improper venue, expiration of the statute of limitations, lack of standing, lack of personal jurisdiction, and failure to state a claim.  For the reasons set forth herein, the Court grants both Motions to Dismiss in their entirety.

## I.  BACKGROUND

### A.  **The Parties**

AJ Ruiz Consultoria Empresarial S.A. ("AJ Ruiz") appears solely as Judicial Administrator and foreign representative of Schahin Holding S/A; Agropecuária Alto Do Turiassú Ltda; Agropecuária Maranhense S/A; Âmbar Empreendimentos E Participações S/C Ltda; Aquática

Comunicações Ltda; Base Engenharia E Serviços De Petróleo E Gás S/A; Base Petróleo E Gas S/A; Companhia Ms De Participações; Companhia Schahin De Ativos; Companhia Schahin Securitizadora De Créditos Financeiros S/S Ltda; Construtora Mogno Ltda; Deep Black Drilling LLP; Foxborough Participações Ltda; Habitécnica Participações S/A; Habitécnica S/A Empreendimentos Imobiliários, Administração E Planejamento; HBF Participações Ltda; HHS Participações S/A; Intelis Automação E Controle Ltda; MTS Participações Ltda; S&S Holding Elétrica S/A; S2 Participações Ltda; Satasch Participações Ltda; SCH 14 Sondas De Produções Maritimas S/A; SCH07 Participações Ltda; SCH08 Participações Ltda; SCH13 Participações Ltda; SCH15 Participações Ltda; Schahin Admnistração E Informática Ltda; Schahin Ativos Companhia Schahin Securitizadora De Créditos Financeiros S/A; Schahin Capital SPE 1 S/A; Schahin Capital SPE 2 S/A; Schahin Desenvolvimento Imobiliário S/A; Schahin Empreendimentos Imobiliários Ltda; Schahin Energia S/A; Schahin Participações Ltda; Schahin Securitizadora De Créditos Financeiros S/A; and SM Participações S/A. (the "Debtors" or the "Schahin Group").  AJ Ruiz has its principal place of business in Brazil.  Am. Compl. ¶ 12.[1]

Defendant Banco Bilbao Vizcaya Argentaria, S.A. ("Banco Bilbao") is a global financial services group with a principal place of business in Spain that is also registered to do business in California.  Am. Compl. ¶ 13.  Defendant Bank of China Limited ("Bank of China") is a company organized and existing in the People's Republic of China, with its principal place of business in China, that also maintains branches in California, Illinois, and New York.  *AP 2* [Am. Compl. ¶

---

[1] As discussed below, there are two separate Amended Complaints.  The first, filed at Docket No. 106 in *AJ Ruiz Consultoria Empresarial S.A. v. Banco Bilbao Vizcaya Argentaria, S.A. et al.*, No. 1:21-cv-06018 (S.D.N.Y. 2021), is now Docket No. 1-102 in adversary proceeding Case No. 21-ap-01213 ("AP 1").  The second, filed at Docket No. 69 in *AJ Ruiz Consultoria Empresarial S.A. v. Bank of China Limited et al.*, No. 1:21-cv-06020 (S.D.N.Y. 2021), is now Docket No. 1-64 in adversary proceeding Case No. 21-ap-01216 ("AP 2").  This opinion references the Amended Complaint in AP 1 unless a reference to AP 2 is specified.

15].   Banco Bilbao and Bank of China, along with twenty-two other international financial institutions worldwide, were involved in transactions with the Schahin Group.

Defendant International Finance Corporation ("IFC") and Defendant Kreditanstalt für Wiederaufbau ("KfW") (collectively, the "Alleged Immune Defendants") are defendants only in AP 2.  Defendant IFC is an international organization established by member countries, including the United States, with its principal place of business in Washington, D.C.  *AP 2* [Am. Compl. ¶ 19].  Defendant KfW is an entity organized and existing under the laws of the Federal Republic of Germany with its principal place of business in Frankfurt, Germany.  *Id.* at ¶ 20.  Majority of KfW shares are owned by the Federal Republic of Germany and minority of KfW shares are owned by the German Federal States.  *AP 2* [Consolidated Mot. at 36 n.13].

### B.  The Foreign Bankruptcy and Chapter 15 Proceedings

In April 2015, principals of the Schahin Group filed for reorganization of twenty-eight entities in Brazil.  Am. Compl. ¶ 94; *see In re Schahin Holding S.A.*, No. 1:19-19932 (Bankr. S.D. Fla. 2015) ("*Schahin Florida Case*") [ECF No. 2, Ex. 1].  In May 2015, the Brazilian bankruptcy court (the "Brazilian Court") ordered that only nine of the twenty-eight entities be included in the reorganization: Schahin Engenharia S/A; Schahin Holding S/A; Schahin Empreendimentos Imobiliarios Ltda; Schahin Desenvolvimento Imobiliarios S/A; Companhia Schahin De Ativos; MTS Participações S/A; SM Participações S/A; Satasch Participações Ltda; and Deep Black Drilling LLP (the "Original Debtors").  Am. Compl. ¶ 94; *Schahin Florida Case* [ECF No. 2, Ex. 1].

On March 1, 2018, the Brazilian Court converted the reorganization into a bankruptcy proceeding due to the Original Debtors' failure to make payments under the reorganization plan.

Am. Compl. ¶ 98.  The Brazilian Court appointed KPMG Corporate Finance Ltda. ("KPMG") as the Judicial Administrator and foreign representative of the bankruptcy estate.  *Id.* at ¶ 100.

On July 26, 2019, KPMG filed a petition (the "Petition Date") under Chapter 15 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Florida in front of the Honorable Judge Robert A. Mark (the "Florida Court").  Am. Compl. ¶ 101.  On August 21, 2019, the Florida Court granted recognition to the Original Debtors' Brazilian bankruptcy proceeding as a foreign main proceeding under section 1517, qualified KPMG as a foreign representative under section 101(24), and authorized KPMG to exercise powers of a trustee under sections 363 and 552 of the Bankruptcy Code.  *Id.* at ¶ 102.

From March 2018 to October 2018, the Brazilian Court entered several orders that added twenty-eight Debtors into the Brazilian bankruptcy case (the "Additional Debtors").[2]  *See Schahin Florida Case* [ECF No. 14, Ex. A].  On September 18, 2019, KPMG filed an Amended Petition for the Additional Debtors to be recognized in the Florida Court.  *Schahin Florida Case* [ECF No. 14, ¶ 4].  The Florida Court recognized the Additional Debtors on October 21, 2019.  Am. Compl. ¶ 103.  Presently, there are thirty-seven Debtors in the Brazilian bankruptcy case and the Brazilian bankruptcy case for those Debtors was recognized in the Schahin Florida Case.

---

[2] The Additional Debtors are: Agropecuária Alto Do Turiassú Ltda.; Agropecuária Maranhense S/A – Agromasa; Âmbar Empreendimentos E Participações S/C Ltda; Aquática Comunicações Ltda; Companhia Ms De Participações; Companhia Schahin Securitizadora De Créditos Financeiros S/S Ltda; Construtora Mogno Ltda; Foxborough Participações Ltda; Habitécnica Participações S/A; Habitécnica S/A, Empreendimentos Imobiliários, Administração E Planejamento; Hbf Participações Ltda; Intelis Automação E Controle Ltda; S&S Holding Elétrica S/A; S2 Participações Ltda; Sch07 Participações Ltda; Sch08 Participações Ltda; Sch13 Participações Ltda; Sch 14 Sondas De Produções Marítimas S/A; Sch15 Participações Ltda; Schahin Administração E Informática Ltda; Schahin Ativos Companhia Schahin Securitizadora De Créditos Financeiros S/A; Schahin Capital Spe 1 S/A; Schahin Capital Spe 2 S/A; Schahin Energia S/A; Schahin Participações Ltda; Base Petróleo E Gás S/A F/K/A Schahin Petróleo E Gás S/A; S.M. Participações S/A; And Hhs Participações S/A.

On September 15, 2020, the Brazilian Court appointed AJ Ruiz to replace KPMG as the sole Judicial Administrator and foreign representative of the Debtors. *Schahin Florida Case* [ECF No. 59, Ex. A]. The Brazilian Court also authorized AJ Ruiz to bring suit in the United States with respect to the sale lease-back transaction. Am. Compl. ¶ 105. On September 20, 2020, the Florida Court entered an Order Substituting AJ Ruiz as the Foreign Representative. *Schahin Florida Case* [ECF No. 59].

### C. **The Adversary Proceedings**

On July 13, 2021, seven years after the sale-leaseback transaction, AJ Ruiz (the "Plaintiff") filed two complaints (the "Initial Complaints") in the United States District Court for the Southern District of New York (the "District Court") against the Defendants in front of the Honorable Judge P. Kevin Castel. *AJ Ruiz Consultoria Empresarial S.A. v. Banco Bilbao Vizcaya Argentaria, S.A,. et al.*, No. 1:21-cv-06018 ("SDNY 1") [ECF No. 1]; *AJ Ruiz Consultoria Empresarial S.A. v. Bank of China Limited, et al.*, No. 1:21-cv-06020 ("SDNY 2") [ECF No. 1].

The SDNY 1 suit was filed against Defendants Banco Bilbao Vizcaya Argentaria, S.A.; Banco Bilbao Vizcaya Argentaria, S.A., Grand Cayman Branch; Caterpillar Financial Services Corporation; Crédit Industriel et Commercial; Deutsche Bank AG, London Branch; Deutsche Bank Trust Company Americas; Hamburg Commercial Bank AG; Intesa Sanpaolo, S.P.A., New York Branch; Itau BBA International PLC; Mitsubishi Corporation; Mitsubishi UFJ Lease & Finance (U.S.A.) Inc.; Mizuho Bank, Ltd.; MS Drillship I S.A.; Nomura Corporate Funding Americas, LLC; Shinhan Bank; Standard Chartered Bank; and Unicredit Bank AG (the "SDNY 1 Defendants"). The SDNY 2 suit was filed against Defendants Bank of China Limited; China Development Bank; Dexis Crédit Local SA; Dexia Crédit Local SA, New York Branch; IFC; KfW; and Portigon AG, New York Branch (the "SDNY 2 Defendants") (collectively, with the SDNY 1

Defendants, the "Defendants").  The Initial Complaints assert an unjust enrichment claim against the Defendants for participating in the sale of the Oil Rigs and receiving repayment of the loans they financed.  *SDNY 1* [ECF No. 1, ¶ 1]; *SDNY 2* [ECF No. 1, ¶ 1].

On November 17, 2021, the Plaintiff filed Amended Complaints in each action adding a claim for relief of aiding and abetting breach of fiduciary duty, alleging that the Defendants aided and abetted the Schahin Group executives in breaching their fiduciary duties by knowingly authorizing the sale of the Oil Rigs (defined below) for substantially less than their appraised value. *SDNY 1* [ECF No. 106, ¶ 128]; *SDNY 2* [ECF No. 69, ¶ 109].  The Plaintiff contends that the Defendants actively participated in the sale-leaseback transaction and also knew the Oil Rigs were being sold at a substantially discounted price.  *SDNY 1* [ECF No. 106, ¶ 129]; *SDNY 2* [ECF No. 69, ¶ 110].

### D.  Procedural History

On December 3, 2021, the Defendants filed a Letter Motion for Leave to File a Motion to Dismiss the Amended Complaints (the "Letter Motion").  *SDNY 1* [ECF No. 107]; *SDNY 2* [ECF No. 76].  Before any conference occurred in the District Court, an order was entered referring both actions to the United States Bankruptcy Court for the Southern District of New York on December 7, 2021.  *SDNY 1* [ECF Nos. 108, 109]; *SDNY 2* [ECF Nos. 77, 78].  As a result, the Letter Motion was denied.  *SDNY 1* [ECF No. 112]; *SDNY 2* [ECF No. 79].

On January 14, 2022, the Plaintiff filed a Motion to Withdraw the Reference (the "Motion to Withdraw").  *AP 1* [ECF No. 10]; *AP 2* [ECF No. 12].  On January 28, 2022, the Defendants filed a Joint Memorandum of Law in Opposition to Plaintiff's Motion to Withdraw along with a Declaration of Daniel M. Perry in Support of the Opposition.  *AP 1* [ECF Nos. 13, 14]; *AP 2* [ECF

Nos. 24, 25]. On February 4, 2022, the Plaintiff filed a Reply in Support of Plaintiff's Motion to Withdraw. *AP 1* [ECF No. 15]; *AP 2* [ECF No. 26]. On June 3, 2022, the Honorable Judge Lorna G. Schofield denied the Plaintiff's Motion to Withdraw in both adversary proceedings without prejudice to any renewed motion to withdraw when the case is trial ready. *AJ Ruiz Consultoria Empresarial S.A. v. Banco Bilbao, et al.*, No. 1:22-cv-00521 (S.D.N.Y. 2022) [ECF No. 6].

On May 19, 2022, the Defendants filed a Consolidated Motion to Dismiss (the "Consolidated Motion") and Memorandum of Law in Support of the Consolidated Motion. *AP 1* [ECF No. 25]; *AP 2* [ECF No. 40]. In addition to joining the Consolidated Motion, Defendant IFC filed a separate Motion to Dismiss or Transfer the Amended Complaint (the "IFC Motion") (collectively, with the Consolidated Motion, the "Motions to Dismiss"). *AP 2* [ECF No. 45]. On May 25, 2022, the Defendants filed the Declarations of Daniel M. Perry (the "Perry Decl.") and Gabriel Seijo Leal de Figueiredo in support of the Consolidated Motion (the "Figueiredo Decl."). *AP 1* [ECF Nos. 26, 27]; *AP 2* [ECF Nos. 51, 52].

On June 23, 2022, the Plaintiff filed an Opposition to the Consolidated Motion (the "Consolidated Opposition") (*AP 1* [ECF No. 34]; *AP 2* [ECF No. 54]) and Opposition to the IFC Motion (the "IFC Opposition") (*AP 2* [ECF No. 57]). The Plaintiff likewise filed the Declarations of Andrew E. Goldsmith and Dr. Francisco Satiro (the "Satiro Decl.") in response to the Consolidated Motion (*AP 1* [ECF Nos. 35, 36]; *AP 2* [ECF Nos. 55, 56]) and the Declaration of Andrew E. Goldsmith in response to the IFC Motion (*AP 2* [ECF No. 58]).

On July 14, 2022, the Defendants filed a Reply in Support of the Consolidated Motion (*AP 1* [ECF No. 39]; *AP 2* [ECF No. 61]) accompanied by Rebuttal Declarations of Alexander B. Lees and Gabriel Seijo Leal de Figueiredo (*AP 1* [ECF Nos. 40, 41]; *AP 2* [ECF Nos. 62, 63]). The

Defendants also filed a Reply in Further Support of the IFC Motion (the "IFC Reply").  *AP 2* [ECF No. 64].

On September 28, 2022, the Court held a hearing on the Motions to Dismiss (the "Hearing").  At the Hearing, the Court granted the request of the Plaintiff's counsel to submit supplemental briefing on the section 108 issue.  Hr'g Tr. at 155:22–157:17; *AP 1* [ECF No. 48]; *AP 2* [ECF No. 71].  On October 7, 2022, the Plaintiff filed a Sur-Reply in Opposition to the Consolidated Motion (the "Sur-Reply").  *AP 1* [ECF No. 47]; *AP 2* [ECF No. 70].  On October 14, 2022, the Defendants filed a Sur-Sur-Reply in Further Support of the Consolidated Motion (the "Sur-Sur-Reply").  *AP 1* [ECF No. 50]; *AP 2* [ECF No. 73].

### E.  Relevant Facts Regarding the Schahin Group

Around 1966, Milton and Salim Schahin, as brothers, founded the Schahin Group, a group of companies in Brazil.  Am. Compl. ¶ 30.  The two brothers allegedly operated the Schahin Group as a single unit that grew to include companies outside Brazil.  *Id.*  Since approximately 2010, the Schahin Group's focus was on the oil and gas industry.  *Id.*  One of the Schahin Group entities, Sea Biscuit International Inc. ("Sea Biscuit"), a British Virgin Islands entity, serves as a holding company whose primary activity is the ownership of Black Gold Drilling LLC ("Black Gold").  *Id.* at ¶¶ 35–36.  Black Gold is a special purpose vehicle that owns Baerfield Drilling LLC ("Baerfield") and Soratu Drilling LLC ("Soratu").  *Id.* at ¶ 37.  Baerfield and Soratu are Delaware entities acting as special purpose vehicles that owned two large semi-submersible oil drilling rigs, the *Amazonia* and *Pantanal*, respectively (collectively, the "Oil Rigs").  *Id.* at ¶¶ 38–39.  These Oil Rigs are at the center of the controversy in these adversary proceedings.

In October 2007, Black Gold entered into a Credit Agreement with a group of lenders, six of which are Defendants here,[3] who agreed to lend Black Gold $800 million to construct the Oil Rigs.  Am. Compl. ¶ 44.  Under the Credit Agreement, the lenders agreed to deliver funds to a New York bank account established by Defendant Deutsche Bank Trust Company Americas ("Deutsche Bank"), who served as Collateral Agent and Loan Paying Agent under the Credit Agreement.  *Id.* at ¶ 47.  The charter and service agreements for the Oil Rigs were pledged by Baerfield and Soratu as collateral for obligations under the Credit Agreement.  *Id.* at ¶ 48.  Black Gold and the lenders amended and restated the Credit Agreement in December 2009 (the "Amended Credit Agreement").  *Id.* at ¶ 53.

In February 2008, Black Gold entered into a separate agreement (the "Subordinated Debt Agreement") with Defendant MS Drillship I S.A., who agreed to lend Black Gold $120 million towards construction of the Oil Rigs.  Am. Compl. ¶ 49.  Defendant MS Drillship I S.A. is a special purpose vehicle entity that was created two months prior for the sole purpose of entering into the loan agreement.  *Id.* at ¶ 50.  Defendant Deutsche Bank also served as Collateral Agent for this agreement, and funds were to be delivered to Defendant Deutsche Bank's New York bank account pursuant to the terms of agreement.  *Id.* at ¶ 51.  The charter and service agreements for the Oil Rigs were likewise pledged as collateral for obligations under the Subordinated Debt Agreement. *Id.* at ¶ 52.  Black Gold and Defendant MS Drillship I S.A. amended and restated the agreement in May 2013 (the "Amended Subordinated Debt Agreement").  *Id.* at ¶ 57.

---

[3] The six Defendant lenders include: Caterpillar Financial Services Corporation; Hamburg Commercial Bank AG (at the time known as HSH Nordbank AG); Intesa Sanpaolo, S.p.A., New York Branch; Mizuho Bank, Ltd. (at the time known as Mizuho Corporate Bank Ltd.); Standard Chartered Bank; and Unicredit Bank AG (at the time known as Bayerische Hypo-Und Vereinsbank AG).  Am. Compl. ¶ 46.  These are Defendants from AP 1.

By the time the Amended Credit Agreement and Amended Subordinated Debt Agreement (the "Loan Agreements") were executed, there were a total of eighteen lenders, which included additional Defendants: Mitsubishi UFJ Lease & Finance (U.S.A.) Inc.; China Development Bank (then known as China Development Bank Corporation); Dexia Crédit Local SA, New York Branch; IFC; KfW; and Portigon AG, New York Branch (then known as WestLB AG, New York Branch). *AP 1* [Am. Compl. ¶ 54]; *AP 2* [Am. Compl. ¶ 42].

In September 2014, Black Gold and the lenders (the "Defendant Assigning Lenders")[4] under the Amended Credit Agreement entered into another agreement (the "Assignment Agreement") in which Sea Biscuit agreed to pay the outstanding principal on the assigned loans and Black Gold agreed to pay the unpaid interest. Am. Compl. ¶ 75. The outstanding principal and interest owed to the Defendant Assignment Lenders was approximately $565 million in total. *Id.* The Assignment Agreement also covered all payments owed to Defendant MS Drillship I S.A. under the Amended Subordinated Debt Agreement. *Id.* at ¶ 79. The obligations under this agreement had reached $180.8 million. *Id.* at ¶ 82.

The Credit Agreement, Amended Credit Agreement, Subordinated Debt Agreement, and Amended Subordinated Debt Agreement each contained a clause stating that the agreements "shall be governed by, and construed in accordance with, the law of the State of New York excluding choice of law principles of such laws which would require the application of the laws of a

---

[4] The Defendant Assigning Lenders under the Amended Credit Agreement include AP 1 Defendants Banco Bilbao Vizcaya Argentaria, S.A., Grand Cayman Branch; Caterpillar Financial Services Corporation; Credit Industriel et Commercial; Deutsche Bank AG, London Branch; Hamburg Commercial Bank AG (at the time known as HSH Nordbank AG); Intesa 20 Sanpaolo, S.p.A., New York Branch; Itau BBA International PLC; Mitsubishi UFJ Lease & Finance (U.S.A.) Inc.; Mizuho Bank, Ltd.; Nomura Corporate Funding Americas, LLC; Shinhan Bank; Standard Chartered Bank; and Unicredit Bank AG; as well as Defendant MS Drillship I S.A. from the Amended Subordinated Debt Agreement (*AP 1* [Am. Compl. ¶ 76]) and, under the Amended Subordinated Debt Agreement, AP 2 Defendants Bank of China; China Development Bank; Dexia Crédit Local SA, New York Branch; IFC; KfW; and Portigon AG, New York Branch (*AP 2* [Am. Compl. ¶ 61]).

jurisdiction other than the State of New York." Am. Compl. ¶ 59.  Each agreement also contained

clauses stating that "any legal action or proceeding with respect to this agreement . . . may be

brought in the courts . . . of the United States of America for the Southern District of New York,"

and that each party "irrevocably waives, to the fullest extent it may do so under applicable law,

any objection which it may now or hereafter have to the laying of venue . . . in the courts referred

to above." *Id.*  Further provisions provided that each party to the agreement "accepts . . . generally

and unconditionally, the non-exclusive jurisdiction of the aforesaid [Southern District of New

York] courts." *Id.*  These provisions were included in the Assignment Agreement as well. *Id.* at

¶ 87.

### F.  The Sale-Leaseback Transaction

In September 2014, after months of financial decline, the Schahin Group closed a

transaction in which the Schahin Group sold the Oil Rigs to subsidiaries of the Industrial and

Commercial Bank of China ("ICBC").  Am. Compl. ¶ 69.  The New York Branch of the ICBC

then leased the Oil Rigs back to Baerfield and Soratu.  *Id.*

The Amended Complaint alleges that the Defendants were involved in the sale-leaseback

transaction as indicated by several interactions during the transaction negotiation period.  For

example, a New York executive of Defendant Mizuho Bank, Ltd. ("Mizuho Bank") requested

drafts of the sale-leaseback documents.  Am. Compl. ¶ 71.  An employee of Nomura Securities

International, Inc., a member of the same corporate family as Defendant Nomura Corporate

Funding Americas, LLC ("Nomura"), also requested information regarding the transaction.  *Id.*

Further, email correspondence between Fernando Schahin and another New York executive of

Defendant Mizuho Bank, in referencing the sale-leaseback and a separate corporate bond matter,

demonstrated that the Defendant company was "acutely aware of its financial interest in both

transactions being executed promptly." *Id.* at ¶ 72.  The Plaintiff alleges that Defendant Nomura's efforts were intended to ensure that the transaction occurred quickly and generated sufficient proceeds to settle loans belonging to the Defendants.  *Id.* at ¶ 73.  The Plaintiff also alleges that other meetings related to the sale-leaseback transaction occurred in New York, including at the ICBC, New York Branch office.  *Id.* at ¶ 74.

The sale-leaseback closing was held at the New York office of Linklaters LLP where Gustavo Shinohara and counsel of the Mitsubishi Defendants attended in person.  Am. Compl. ¶ 74.  The remaining Defendants attended, either directly or through counsel, via conference call hosted by Linklaters LLP.  *Id.*  Afterwards, in its position as Collateral Agent and Loan Paying Agent under the Loan Agreements, Defendant Deutsche Bank directed for payments, available from the proceeds of the Oil Rig sale-leaseback, to be made using wire transfers from Defendant Deutsche Bank's New York bank account to accounts for each of the Defendant Assigning Lenders.  *Id.* at ¶ 80.  The Defendant Assigning Lenders received such payments in their respective New York bank accounts, except for Defendant Mitsubishi UFJ Lease & Finance (U.S.A.) Inc. which used an Illinois bank account instead.  *Id.*

The Amended Complaint alleges that, months before the sale-leaseback closing, the *Amazonia* was appraised for $651 million and the *Pantanal* was appraised for $703 million.  Am. Compl. ¶ 73.  The Oil Rigs were sold in the sale lease-back transaction for $540 million each, approximately $274 million less than their combined appraised value.  *Id.*  In total, $178 million of proceeds were used to settle a lawsuit involving failure to repay loans obtained from a Singapore shipbuilder that built the Oil Rigs (*AP 2* [Am. Compl. ¶ 67]), while other proceeds were used to repay, in full and sooner than would have been otherwise, the loans of the Defendant Assigning Lenders to which the Oil Rigs secured (Am. Compl. ¶¶ 80, 82).

14

The Amended Complaint further alleges that Eonio Rocha and Gustavo Shinohara, CEO and CFO, respectively, of Debtor Petróleo e Gás S/A, n/k/a Base Petróleo e Gás S/A, and non-debtor Schahin Group company Schahin Oil & Gas Ltd, secretly plotted to leave the Schahin Group and start their own firm, Bambu Servicos de Petroleo e Gas Ltda ("Bambu"). Am. Compl. ¶ 88. Rocha and Shinohara were granted powers of attorney to act on behalf of Baerfield and Soratu with respect to the sale-leaseback transaction, to which they later signed off on the contracts with ICBC. *Id.* at ¶ 70. Within a month of the sale-leaseback transaction, Rocha and Shinohara, on behalf of Bambu, began setting up meetings with partners of the ICBC to operate the Oil Rigs after the Schahin Group went out of business. *Id.* at ¶ 88. By April 2015, Rocha and Shinohara resigned from their respective positions with the Schahin Group. *Id.* at ¶ 93. The ICBC terminated the Schahin Group leases and took possession of the Oil Rigs in June 2015, with Bambu playing a key role on the ICBC's behalf. *Id.* at ¶¶ 93, 96. The Plaintiff alleges that the Defendants were aware of the conflict with former Schahin Group executives and use of insider information no later than two weeks after the ICBC repossessed the Oil Rigs. *Id.* at ¶ 97.

## II. STANDARD OF REVIEW

The Consolidated Motion seeks dismissal under Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6) (the "Federal Rules"). The IFC Motion seeks dismissal under Federal Rules 12(b)(1) and 12(b)(3). Federal Rule 12(b) is made applicable to these adversary proceedings through Rule 7012(b) of the Federal Rules of Bankruptcy Procedure.

### A. **Rule 12(b)(1)**

Rule 12(b)(1) provides for dismissal for lack of subject matter jurisdiction. A motion to dismiss brought based upon the Foreign Sovereign Immunities Act ("FSIA") is considered a motion to dismiss under Rule 12(b)(1). *Daou v. BLC Bank, S.A.L.*, No. 20-cv-4438, 2021 U.S.

Dist. LEXIS 69502, at *15 (S.D.N.Y. Apr. 9, 2021) (citing *Pablo Star Ltd. v. Welsh Gov't*, 961 F.3d 555, 559 (2d Cir. 2020)).   A motion to dismiss pursuant to the International Organizations Immunities Act ("IOIA") is likewise considered under Rule 12(b)(1) because immunity under the IOIA is co-extensive with the immunity accorded under the FSIA.   *See Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 772 (2019); *see also El Omari v. Int'l Criminal Police Organization-Interpol*, No. 19-cv-1457, 2021 U.S. Dist. LEXIS 91701, at *9–11, 17 (E.D.N.Y. May 13, 2021); and *De Luca v. United Nations Org.*, 841 F. Supp. 531, 533 n.1 (S.D.N.Y. 1994).

A defendant seeking to dismiss on the basis of immunity typically has "the burden of establishing a prima facie case that it is a foreign sovereign."   *Pablo Star*, 961 F.3d at 559–60 (citing *Anglo-Iberia Underwriting Mgmt. v. P.T. Jamsostek*, 600 F.3d 171, 175 (2d Cir. 2010)). After such a showing by the defendant, the burden then shifts to the plaintiff to establish that an exception to sovereign immunity applies.   *Pablo Star*, 961 F.3d at 560 (citing *Anglo-Iberia Underwriting Mgmt.*, 600 F.3d at 175).   The ultimate burden of persuasion remains with the defendant.   *Figueroa v. Ministry for Foreign Affairs of Swed.*, 222 F. Supp. 3d 304, 307 (S.D.N.Y. 2016).

When a defendant seeks dismissal for lack of standing under Rule 12(b)(1), the burden is different.   Instead, "[t]he plaintiff, as the party invoking federal jurisdiction," bears the burden of pleading and establishing the three standing requirements "[i]n order to show the 'irreducible constitutional minimum' of standing."   *McNeil v. Yale Chptr.*, No. 21-639-cv, 2021 U.S. App. LEXIS 33750, at *3–4 (2d Cir. Nov. 15, 2021) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

In determining whether the burdens are met under a Rule 12(b)(1) motion to dismiss, the court must "view the complaint liberally and accept as true all material facts alleged in the

complaint." *In re Ener1, Inc.*, 558 B.R. 91, 94 (Bankr. S.D.N.Y. 2016).  Generally, and as will be applied for the motion to dismiss for lack of standing, the court will analyze whether a prima facie case is established by viewing the facts in a light most favorable to the plaintiff.  *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  However, when considering a motion to dismiss pursuant to the FSIA or IOIA, the court "does not draw all reasonable inferences in the plaintiff's favor." *Schansman v. Sberbank of Russ. PJSC*, No. 19-cv-02985, 2022 U.S. Dist. LEXIS 219959, at *5 (S.D.N.Y. Dec. 6, 2022) (quoting *Figueroa*, 222 F. Supp. 3d at 307).  To resolve disputed jurisdictional fact issues, the court has discretion to consider additional documents beyond the pleadings, such as affidavits, documents, and testimony.  *Schansman*, 2022 U.S. Dist. LEXIS 219959, at *5 (citation omitted).  The court may also consider facts and matters of which judicial notice may be taken.  *Hertz Corp. v. City of N.Y.*, 1 F.3d 121, 125 (2d Cir. 1993).

### B. Rule 12(b)(2)

To survive a Rule 12(b)(2) motion, "the plaintiff bears the burden of establishing personal jurisdiction." *BWP Media USA, Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d 342, 349 (S.D.N.Y. 2014) (citing *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012)).  Where the court is relying on pleadings and affidavits, as opposed to an evidentiary hearing, the plaintiff "need only make a prima facie showing of personal jurisdiction over the defendant[s]." *Kaplan Grp. Invs. LLC v. A.S.A.P. Logistics Ltd.*, No. 22-cv-7326, 2023 U.S. Dist. LEXIS 170378, at *8 (S.D.N.Y. Sept. 25, 2023) (quoting *Porina v. Marward Shipping Co., Ltd.*, 521 F.3d 122, 126 (2d Cir. 2008)).  The prima facie showing may be accomplished solely by allegations, pleaded in good faith, that state particular facts amounting to more than conclusory statements and supporting a finding that jurisdiction exists.  *Kaplan,* 2023 U.S. Dist. LEXIS 170378, at *8 (citing *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184 (2d Cir. 1998).

In deciding whether to dismiss a complaint for lack of personal jurisdiction, the court will construe all allegations and resolve all doubts in the plaintiff's favor. *BWP Media*, 69 F. Supp. 3d at 349 (citing *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993)). However, the court will not "draw argumentative inferences in the plaintiff's favor, nor accept as true a legal conclusion couched as a factual allegation." *BWP Media*, 69 F. Supp. 3d at 349 (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL ("Licci I")*, 673 F.3d 50, 59 (2d Cir. 2012)).

### C.  Rule 12(b)(3)

Rule 12(b)(3) provides for dismissal where venue is improper. Where the court will make its determination based on the pleadings, the burden of proof rests with the plaintiff to establish a prima facie case. *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005); *Kaplan*, 2023 U.S. Dist. LEXIS 170378, at *8. The court should view all facts in the light most favorable to the plaintiff in determining whether the plaintiff has met its burden to establish proper venue. *Kaplan*, 2023 U.S. Dist. LEXIS 170378, at *8–9 (citing *TradeComet.com LLC v. Google, Inc.*, 647 F.3d 472, 475 (2d Cir. 2011)).

### D.  Rule 12(b)(6)

Rule 12(b)(6) provides for dismissal for "failure to state a claim upon which relief can be granted." To survive a Rule 12(b)(6) motion, the plaintiff must make a prima facie showing that the complaint "contain[s] sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court must consider "the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

In deciding a motion to dismiss under Rule 12(b)(6), the court should construe the factual allegations therein as true and determine whether such allegations meet the plausibility standard. *Twombly*, 550 U.S. at 556. "The plausibility standard is not akin to a 'probability requirement,'" but does require "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678; *see also Twombly*, 550 U.S. at 556 ("[The plausibility requirement] simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."). The determination as to "whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. While drawing all inferences in favor of the plaintiff, the court need not "accept as true a legal conclusion couched as a factual allegation." *Id.* at 678.

## III. DISCUSSION

### A. <u>Defendants IFC and KfW are Immune from Suit</u>

The Consolidated Motion asserts, under Rule 12(b)(1), that the Alleged Immune Defendants are immune from suit under the FSIA and IOIA, respectively. The IFC Motion further asserts Defendant IFC's immunity under the IOIA and the IFC's Articles of Agreement (the "IFC Articles"). The Plaintiff contends that the Alleged Immune Defendants waived immunity, or alternatively, that the commercial activity exception otherwise permits claims to be brought against the Alleged Immune Defendants.

#### 1. *Applicability of FSIA and IOIA*

The FSIA grants "foreign states" presumptive immunity from subject matter jurisdiction of United States courts unless a specified exception applies. 28 U.S.C. § 1604. A "'foreign state'

includes a political subdivision . . . or an agency or instrumentality of a foreign state."  28 U.S.C. § 1603(a).  An "agency or instrumentality" is "any entity which is an organ of a foreign state . . . or a majority of whose shares or other ownership interest is owned by a foreign state."  28 U.S.C. § 1603(b)(2).  As the Defendants indicate in the Consolidated Motion, and as is undisputed by the Plaintiff, all shares of KfW are owned by either the Federal Republic of Germany or the German Federal States.  Consolidated Mot. at 36 n.13.  This effectively renders KfW an "agency or instrumentality" of a foreign state and satisfies the Defendants' initial burden of establishing immunity.

Under the IOIA, "international organizations" are provided the same immunity "as is enjoyed by foreign governments, except to the extent that such organizations may expressly waive their immunity."  22 U.S.C. § 288a(b).  "'[I]nternational organization' means a public international organization in which the United States participates . . . [and has] been designated by the President . . . as being entitled to enjoy the privileges, exemptions, and immunities provided in [Section 288]."  22 U.S.C. § 288.  It is also undisputed by the parties, and is supported by case law, that the IFC is a public international organization entitled to immunity under the IOIA.  Consolidated Mot. at 36; IFC Mot. at 3; *Banco de Seguros del Estado v. Int'l Fin. Corp.*, No. 06 CIV. 2427, 2007 U.S. Dist. LEXIS 69741, at *11 (S.D.N.Y. Sept. 20, 2007) ("IFC qualifies as an 'international organization' under the IOIA, because it was designated by Executive Order 10680 as a public international organization entitled to enjoy the privileges, exemptions, and immunities conferred by the IOIA.").  The Defendants' initial burden of establishing IFC's immunity under the IOIA is likewise met.

## 2.  *The Alleged Immune Defendants Did Not Waive Immunity*

The burden then shifts back to the Plaintiff to show that the Alleged Immune Defendants waived immunity.  The FSIA denies immunity to a foreign state that waives immunity either explicitly or implicitly.  28 U.S.C. § 1605(a)(1).  The IOIA limits immunity only upon express waiver by the party or modification of the Executive Order of the President.[5]  *Banco de Seguros*, 2007 U.S. Dist. LEXIS 69741, at *13 (citing *Mendaro v. World Bank*, 717 F.2d 610, 613 (D.C. Cir. 1983)).

Courts have found waiver to exist in contracts "where a foreign state has agreed that the law of a particular country should govern."  *Shapiro v. Republic of Bol.*, 930 F.3d 1013, 1017 (2d Cir. 1991) (citing H.R. Rep. No. 94-1487, at 6617 (1976)).  However, federal courts have narrowly interpreted the waiver exception under the FSIA and IOIA as well as the purported waivers contained in such contracts.  *Shapiro*, 930 F.2d at 1017; *Fir Tree Capital Opportunity Master Fund, LP v. Anglo Ir. Bank Corp.*, No. 11 Civ. 0955, 2011 U.S. Dist. LEXIS 136018, at *23–24 (S.D.N.Y. Nov. 28, 2011).  "[A] waiver will not be implied . . . absent strong evidence of the sovereign's intent."  *Fir Tree*, 2011 U.S. Dist. LEXIS 136018, at *23 (quoting *Cargill Int'l. S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1017 (2d Cir. 1993)).  The District Court for the Southern District of New York has adopted the holding by the D.C. Circuit that "waiver applied only to 'suits brought by [the immune defendant's] debtors, creditors, bondholders, and those other potential plaintiffs to whom [the immune defendant] would have to subject itself to suit in order to achieve its chartered object.'"  *Banco de Seguros*, 2007 U.S. Dist. LEXIS 69741, at *16 (quoting *Mendaro*, 717 F.2d at 615).

---

[5] "There has been no modification of the Executive Order of the President pertaining to IFC."  *Banco de Seguros*, 2007 U.S. Dist. LEXIS 69741, at *13.  To date, this remains true.

To demonstrate waiver, the Plaintiff points to the Amended Credit Agreement and Assignment Agreement, both signed by the Alleged Immune Defendants.  Consolidated Opp'n. at 38.  These agreements, which the Plaintiff is not a signatory to, include provisions requiring any legal action to be brought in the Southern District of New York.  *Id.*; *see supra* Section I.E.  The Alleged Immune Defendants argue that, because the Plaintiff is not a signatory to these documents, the Plaintiff may not rely on these provisions as evidence of a waiver of immunity.  *Banco de Seguros*, 2007 U.S. Dist. LEXIS 69741, at *21–22 ("[N]one of the Plaintiffs was a party to that agreement, and thus Plaintiffs may not enforce any provisions of that agreement against IFC.").

The Plaintiff contends that the later-decided *Magi XXI* case governs, where the Second Circuit found that a non-signatory to a contract may enforce a forum selection clause if the non-signatory is "closely related" to another signatory and their enforcement is "'foreseeable' to the signatory against whom the non-signatory wishes to enforce."  Consolidated Opp'n. at 39; *Magi XXI, Inc. v. Stato della Città del Vaticano*, 714 F.3d 714, 723 (2d Cir. 2013).  In that case, Second Renaissance and the Vatican Office of Publications (the "Vatican Office") were parties to a Master License Agreement (the "MLA").  *Id.* at 718.  Under the MLA, the Vatican Office, acting on behalf of the Vatican State, granted rights to Second Renaissance to sublicense certain artwork.  *Id.*  The following year, the Vatican Office approved several sublicense agreements between Second Renaissance and Magi XXI (the "Sublicense Agreements").  *Id.*  The MLA and the Sublicense Agreements contained identical forum selection clauses under which the parties consented to jurisdiction in the Sovereign State of Vatican City.  *Id.* at 718–19.

Thereafter, Magi XXI filed a complaint in the United States District Court for the Eastern District of New York against Second Renaissance and the Vatican State, which the Vatican State sought to dismiss based on the forum selection clauses in the Sublicense Agreements.  *Id.* at 719.

At the district court level, Magi XXI argued that "enforcement of the forum selection clauses here would be 'unreasonable or unjust.'" *Id.* at 721. Even though Magi XXI did not raise this argument on appeal, the Second Circuit addressed it anyway. *Id.*

The Second Circuit found that the non-signatory (Vatican State) was known by the signatory (Magi XXI) "as the source of the contractual authority granted to Magi [XXI] by the Sublicense Agreements." *Id.* at 724.[6] Based on the court's observations, the "Vatican State and Second Renaissance were 'closely related' parties, and it was foreseeable that the Vatican State would enforce the forum selection clauses in the Sublicense Agreements against Magi [XXI]." *Id.* at 724. The facts of these adversary proceedings, however, render this case inapposite.

Under the required narrow construction, it is implausible to find that the Alleged Immune Defendants could foresee that the Plaintiff (a party to a bankruptcy proceeding that was initiated *years after* the executed agreements) would seek to enforce the forum selection clauses contained in the Loan Agreements on behalf of parties with whom the Alleged Immune Defendants were not conducting business. At the time they entered into the Loan Agreements, the Alleged Immune Defendants were not, and could not, be aware of the Judicial Administrator and foreign representative that did not yet exist. Such an attenuated relationship fails to meet the conditions of being "closely related" and "foreseeable" that *Magi XXI* permitted and therefore, fails to overcome the non-signatory limitation addressed in *Banco de Seguros*. Further, the Plaintiff is not

---

[6] The Second Circuit observed that (i) the Sublicense Agreements were subject to approval of the Vatican State, (ii) the artwork made available under the agreements was owned by the Vatican State, (iii) any products made by Magi XXI were subject to approval by the Vatican State, (iv) Magi XXI's interests were derivative of Second Renaissance's interests under the MLA, (v) should there be any conflict between the MLA and the Sublicense Agreements, the MLA would control, and (vi) Magi XXI considered itself a third-party beneficiary of the MLA. *Magi XXI, Inc.*, 714 F.3d at 723.

a "debtor, creditor, or bondholder" of the Alleged Immune Defendants, and likewise does not meet the limitation adopted by the D.C. Circuit in *Mendaro*.

The Plaintiff fails to provide strong evidence indicating the sovereigns' intent to waive immunity. Accordingly, the Court finds that there was no explicit or implicit waiver of immunity by either of the Alleged Immune Defendants.

### 3.   *The Commercial Activity Exception Does Not Apply*

Nor does the Plaintiff establish that the commercial activity exception applies to the Alleged Immune Defendants. The FSIA's commercial activity exception provides that a foreign state will not be immune from suit when the suit is: "[(i)] based upon a commercial activity carried on in the United States by the foreign state; [(ii)] or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; [(iii)] or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). Because the IOIA confers on international organizations "the same immunity from suit . . . as is enjoyed by foreign governments" under the FSIA, the Court will analyze this exception under the FSIA on behalf of both Alleged Immune Defendants. 22 U.S.C. § 288a(b); *see Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 766 (2019) (holding that the IOIA does not confer absolute immunity from suit, and rather is limited in accordance with the FSIA exceptions to immunity).

For each clause under the exception, the Plaintiff must show "(1) a 'commercial activity' carried on by or of a foreign state, (2) a nexus between the activity and basis of the plaintiff's claim, and (3) a geographical connection with the United States." *Pablo Star Ltd. v. Welsh Gov't*, 378 F. Supp. 3d 300, 307 (S.D.N.Y. 2019).

### i. __Preliminary Analysis__

#### a. **The Gravamen of the Suit**

The Court will begin by identifying the activity on which the Amended Complaint is based, or the "gravamen" of the suit. *Pablo Star*, 378 F. Supp. 3d at 308. The Alleged Immune Defendants contend that the Amended Complaint is not "based upon" their own conduct, but rather upon the conduct of non-defendants Black Gold, Sea Biscuit, Baerfield, and Soratu having engaged in the sale-leaseback transaction with subsidiaries of the ICBC. Consolidated Mot. at 37–38. The Plaintiff argues that its claims are based upon the Alleged Immune Defendants having improperly obtained repayment of their commercial loan transactions following the sale-leaseback transaction. Consolidated Opp'n. at 40.

For purposes of the Motions to Dismiss, the Court finds that the "gravamen" of the suit is, in fact, the repayment of the Defendant Assigning Lenders with proceeds obtained through the sale-leaseback transaction. According to the first paragraphs of the Amended Complaints, the Plaintiff "brings claims . . . to recover more than [$465 million or $310 million] that Defendants unlawfully obtained at [the expense of the Debtor's other creditors]." *AP 1* [Am. Compl. ¶ 1]; *AP 2* [Am. Compl. ¶ 1].

Even though the Court does not find such conduct (the repayment of the loans) to be a proper basis for the alleged causes of action, as it will explain further in Section III.F, such conduct is nonetheless identifiable as the gravamen of the suit for purposes of analyzing the commercial activity exception. The core of the suit here concerns the repayment of the Defendant Assigning Lenders because, but for the existence of the Loan Agreements and Assignment Agreements that provided for the prompt repayment of their loans following the sale-leaseback transaction, the Plaintiff (on behalf of the Debtors' other creditors) would not have allegedly been injured. *OBB*

25

*Personenverkehr AG v. Sachs*, 577 U.S. 27, 28, 35 (2015) (requiring that the court "zero[] in on the core of the plaintiffs' suit" that is the "wrongful conduct" that "led to [the] injuries suffered").

### b.  Commercial Activity

Next, the Court will consider whether such conduct is considered a "commercial activity" for purposes of the statute.  "Commercial activity" is defined as "a regular course of commercial conduct or a particular commercial transaction or act."  28 U.S.C. § 1603(d).  The Supreme Court noted that it is not necessarily "clear that the lending activity of all development banks qualifies as commercial activity within the meaning of the FSIA."  *Jam*, 139 S. Ct. at 763.  However, the Second Circuit has recognized that agreements requiring payments to be made to certain bank accounts constitute "commercial activity."  *Com. Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 241 (2d Cir. 1994).  The Court therefore finds that the conduct engaged in by the Alleged Immune Defendants – the financing of loans and arrangement for repayment – which gives rise to the suit, is commercial activity.  *Pablo Star*, 378 F. Supp. 3d at 308 (explaining that a foreign state engages in commercial activity by acting like a private player within the market).

Although the Amended Complaint concerns the commercial activity of the Alleged Immune Defendants, the Plaintiff fails to establish the nexus between the commercial activity and the Plaintiff's claims as well as the requisite "substantial connection" to or "direct effect" on the United States as required under Clauses 1 and 3 of the commercial activity exception.

### ii.  <u>Clause 1: Based Upon A Commercial Activity Carried On In The United States By The Foreign State</u>

The Second Circuit has explained that "'[b]ased upon' requires a degree of closeness between the acts giving rise to the cause of action and those needed to establish jurisdiction that is

considerably greater than common law causation requirements." *Kensington Int'l, Ltd. v. Itoua*, 505 F.3d 147, 155 (2d Cir. 2007) (citation omitted).  This degree of closeness also requires "substantial contact" between the "particular conduct giving rise to the claim [be] part of a commercial activity . . . [and] the United States."  *See* 28 U.S.C. § 1603(e); *In re N. Sea Brent Crude Oil Future Litig.*, No 13-md-02475, 2016 U.S. Dist. LEXIS 41495, at *33 (S.D.N.Y. Mar. 29, 2016); *see also Shapiro v. Republic of Bol.*, 930 F.2d 1013, 1018 (2d Cir. 1991).  While Congress has "left it to the courts to define the contours of 'substantial contact' . . . it is clear that Congress intended a tighter nexus than the 'minimum contacts' standard for due process." *Shapiro*, 930 F.2d at 1019.

The Plaintiff argues that, because the negotiations, the closing of the sale-leaseback transaction, and subsequent wire transfers occurred in New York, there is a sufficient geographical connection to the United States.  IFC Opp'n. at 10.  In the Amended Complaint in AP 1, the only specific Defendants alleged to have engaged in negotiations prior to the closing are Defendant Mizuho Bank and Defendant Nomura.  *AP 1* [Am. Compl. ¶¶ 71–72].

However, the Alleged Immune Defendants are defendants only in AP 2.  The Amended Complaint in AP 2 fails to demonstrate "substantial contact" on behalf of the Alleged Immune Defendants.  The only references to the Alleged Immune Defendants include their participation as lenders under the Loan Agreements and subsequent receipt of repayment via wire transfers to their respective New York bank accounts.  *AP 2* [Am. Compl. ¶¶ 37, 42, 61, 63, 64].  Because the Plaintiff is not a party to the agreements, the existence of forum selection clauses should not be given any weight here.  *See supra* Section III.A.2.

There are no specific allegations that the Alleged Immune Defendants were aware of the appraisals of the Oil Rigs, the timeline of the transaction, or the intent for the Oil Rigs to be sold

in a sale-leaseback transaction.  Because these pertinent details are unclear in the Amended Complaints, the Court cannot be persuaded that there was "substantial contact" between any conduct of the Alleged Immune Defendants and the United States.  *Jam v. Int'l Fin. Corp.*, 442 F. Supp. 3d 162, 178 (D.D.C. 2020) (finding that there was not "substantial contact" where the court had the "speculate as to what kind of conduct . . . actually took place").

### iii. Clause 3: Based Upon An Act Outside The Territory Of The United States In Connection With A Commercial Activity Of The Foreign State Elsewhere And That Act Causes A Direct Effect In The United States

The Court also addresses Clause 3 of the commercial activity exception because of the reference made by the Plaintiff in the Consolidated Opposition.  The Plaintiff did not address Clause 3 at the Hearing in its oral argument on the Motions to Dismiss because it believed it had satisfied Clause 1.  Hr'g Tr. at 147.

In its Consolidated Opposition, the Plaintiff cites to *Consulting Concepts Int'l, Inc. v. Kingdom of Saudia Arabia* to suggest that it has established a "direct effect" in the United States. No. 19-11787, 2021 Dist. LEXIS 64209 (S.D.N.Y. Apr. 1, 2021).  This case explains that the "direct effect" requirement is satisfied where "parties to a transaction, including the sovereign defendant, specifically agree or specifically contemplate that payment will be made to a United States bank account, and the plaintiff's cause of action arises out of that transaction." *Id.* at *9 n.1.

It is evident that such a transaction exists here.  The Amended Complaint alleges that, pursuant to the Assignment Agreement, Defendant Deutsche Bank (the Collateral Agent and Loan Paying Agent) received payment in its New York bank account, and then wired such payment to

the Defendant Assigning Lenders' New York bank accounts, including those of the Alleged Immune Defendants. *AP 2* [Am. Compl. ¶ 63].

However, the Court finds there is no "material connection" to the Plaintiff's causes of action, as is also required in this circuit. *See Com. Bank of Kuwait*, 15 F.3d at 241. In *Commercial Bank of Kuwait*, the Second Circuit acknowledged that a "direct effect" on the United States existed when payment was to occur in New York. *Id.* The Second Circuit also required a "material connection" between the plaintiff's cause of action and the commercial activity of the defendant. *Id.* The court found a "material connection" existed because the cause of action specifically concerned failure to effectuate payment to the New York bank accounts under the loan and guaranty agreements. *Id.* at 240–42 ("The failure of the [sovereign defendant] to remit funds in New York, as they were contractually bound to do, had a direct effect in the United States.").

As noted above in the discussion regarding Clause 1, and as will be discussed further in Section III.F, the Plaintiff fails to establish that its causes of action, unjust enrichment and aiding and abetting breach of fiduciary duty, are plausible based on the alleged facts. The Amended Complaints allege generally that the Defendants (as a whole) were aware of the true value of the Oil Rigs based on their mere position as lenders and creditors of the Schahin Group (*AP 1* [Am. Compl. ¶ 129]; *AP 2* [Am. Compl. ¶ 110]), and that the Defendants (again, as a whole) became aware of the conflict with Schahin Group executives and use of insider information by no later than June 2015, which was nine months after the closing of the sale-leaseback transaction (*AP* 1 [Am. Compl. ¶ 131]; *AP* 2 [Am. Compl. ¶ 112]).

Because the allegations in the Amended Complaints regarding the Alleged Immune Defendants' involvement in the sale-leaseback transaction are vague and do not include any specificity with respect to the Alleged Immune Defendants' conduct, there cannot be a "material

connection" to the alleged aiding and abetting.  The only allegations against the Alleged Immune Defendants in the Amended Complaints are that they were financial lenders to non-debtor borrowers and the loans were repaid, which allegations are insufficient to support a "material connection" to any alleged unjust enrichment.  The facts alleged in the Amended Complaints are too vague and the relation to the alleged causes of action too attenuated.  Because the Plaintiff does not establish a "material connection" between the conduct of the Alleged Immune Defendants and the two causes of action, the Court finds that there is no "direct effect" as required under Clause 3.  Therefore, the commercial activity exception does not apply.

For the foregoing reasons, the Court finds that the Alleged Immune Defendants are immune from suit under the FSIA and IOIA, respectively.  The Amended Complaint in AP 2 is dismissed against the Alleged Immune Defendants for lack of subject matter jurisdiction under Rule 12(b)(1).

## B.  <u>Venue is Improper</u>

The IFC Motion asserts that venue is improper under 22 U.S.C. § 282f and 28 U.S.C. § 1391(f)(1) and that the Amended Complaint as against Defendant IFC should either be dismissed or transferred to the District of Columbia.  The Plaintiff argues that venue is proper based on the forum selection clauses, or alternatively, under the FSIA and section 1391(f)(1).

### 1.  *Articles of Agreement*

First, Defendant IFC contends that the IFC Articles and the Bretton Woods Agreement Act limit venue solely to the District of Columbia.  IFC Mot. at 5–6.  The Plaintiff opposes this narrow reading and relies again on the forum selection clauses in the Loan Agreements.  IFC Opp'n. at 7–9.

The relevant part of the Articles of Agreement states that: "[a]ctions may be brought against the [IFC] only in a court of competent jurisdiction in the territories of a member in which the [IFC] has an office."  Articles of Agreement of the International Finance Corporation, art. VI, § 3, Dec. 5, 1955, 7 U.S.T. 2193, T.I.A.S. No. 3620 (as amended through Apr. 16, 2020) ("IFC Articles").  The relevant part of the Bretton Woods Agreement Act[7] states that: "[the IFC] shall be deemed to be an inhabitant of the Federal judicial district in which its principal office in the United States is located."  22 U.S.C. § 282f.

 Defendant IFC reads these provisions to mean that it can only be sued in the District of Columbia because that is where its principal office in the United States is located.  IFC Mot. at 6; IFC Reply at 7.  The Plaintiff suggests that Defendant IFC fails to cite any case law supporting its interpretation of these provisions and engages in its own in-depth interpretation of the language used in the IFC Articles.  IFC Opp'n. at 8–9.

However, the District Court for the Southern District of New York, in *Banco de Seguros*, suggested an interpretation more in line with Defendant IFC's interpretation.  In that case, the court noted that "[t]he IOIA and IFC's enabling legislation provide a comprehensive statutory scheme governing . . . venue."  2007 U.S. Dist. LEXIS 69741, at *11.  The court recognized that section 282f grants "original jurisdiction over any action to which IFC is a party to the U.S. district court in which IFC's principal office is located, providing that IFC is deemed to be an inhabitant of that district," and thereby "provid[es] venue for such actions in that district."  *Id.* at 12.  The Plaintiff

---

[7] The Court notes that the Bretton Woods Agreement Act is not directly on point here because it governs only the International Monetary Fund and the International Bank for Reconstruction and Development (the "Bank"). However, the IFC Articles provide that "[t]he principal office of the [IFC] shall be in the same locality as the principal office of the Bank." *IFC Articles*, art. IV, section 8. Based on the District Court's interpretation of section 282f, as discussed herein, the Court acknowledges the interrelation of the Bretton Woods Agreement Act and the IFC Articles and the importance of the location of the IFC's principal office.

does not dispute that Defendant IFC's principal office is located in Washington, D.C.  Following the court in *Banco de Seguros*, this Court finds that the District Court for the District of Columbia is the "competent jurisdiction" referenced in the IFC Articles because Defendant IFC is an inhabitant of that district.  The Plaintiff's analysis of the use of certain words throughout the IFC Articles does not change this.  IFC Opp'n. at 7–8.  Venue is proper in the District Court for the District of Columbia, and the Court declines to expand this finding further with respect to the Plaintiff's argument.[8]

Where venue is proper in the District of Columbia under the IFC Articles, the only way for venue to also be proper in New York would be if Defendant IFC waived venue by contract.  *See Concesionaria DHM, S.A. v. Int'l Fin. Corp.*, 307 F. Supp. 2d 533, 562–63 (S.D.N.Y. 2004) (analyzing the use of a permissive forum selection clause in loan agreements to deem New York proper venue).  Because the Plaintiff is not a signatory to the Loan Agreements, the Court finds that it may not seek to enforce the forum selection provisions for venue purposes.

Therefore, the Court finds that in this case and with these particular facts, Defendant IFC can only be sued in the District of Columbia pursuant to the IFC Articles.  However, since the Court grants Defendant IFC's Motion on other grounds, *see supra* Section III.A., no transfer of venue is necessary.

---

[8] The Plaintiff focuses on the words "territories," "locality," "office," and "member," suggesting that application of the Supreme Court's construction of qualifying phrases enables Defendant IFC to be sued anywhere within the United States, so long as it had an office within the country.  Although the Plaintiff contends that Defendant IFC's position is not supported by case law, neither is the Plaintiff's argument.  At this time, the Court declines to take such an extreme position, especially when case law within this circuit provides a reasonable answer to the question at hand.

###### 2. *FSIA and Section 1391(f)(1)*

Second, Defendant IFC contends that venue is improper in New York under 28 U.S.C. § 1391(f)(1) because a "substantial" part of the events at issue do not occur in New York.  IFC Mot. at 6–7.  The Plaintiff disagrees, contending that it has alleged a sufficient number of events occurring in New York.  IFC Opp'n. at 10.  "[A]s foreign sovereign immunity extends in its entirety to international organizations, *see Jam*, *139 S. Ct. at 769*, international organization immunity must necessarily encompass Section 1391(f)'s venue restrictions."  *Rodriguez v. Pan Am Health Org.*, 612 F. Supp. 3d 1372, 1382 (S.D. Fla. 2020).  Under section 1391(f)(1), venue is proper "in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred."

The Second Circuit has referenced the Eleventh Circuit's explanation that there must be a close nexus between the material acts and the plaintiff's claims in order for the events at issue to be properly deemed substantial.  *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 432 (2d Cir. 2005) (citing *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1372 (11th Cir. 2003)).  Even though this circuit has not explicitly adopted this exact substantiality requirement, it has nonetheless relied on such principle in conducting a venue analysis.  *Daniel*, 428 F.3d at 432–33.

In *Concesionaria*, the court found venue proper in New York even when the in-person negotiations took place mainly in Caracas, Venezuela and Washington, D.C., and the closing on the loans took place in Washington, D.C.  307 F. Supp. 2d at 556, 561.  This was because the court found that "New York City was the hub for the financial transfers that were at the core of the parties' bilateral duties under the loan agreements."  *Id.* at 559–61 (finding a substantial part of events to have occurred in New York because the defendant received payments to a New York

bank account, the parties retained New York law firms as counsel, and the virtual negotiations of the loan agreements were attended by both parties' New York counsel).

"'Substantiality' for venue purposes is more a qualitative than a quantitative inquiry." *Daniel*, 428 F.3d at 432–33 (citations omitted). Therefore, the Plaintiff's contention that they "allege[] *more* New York events than *Concesionaria*" is not availing. IFC Opp'n. at 10; *Daniel*, 428 F.3d at 433 (explaining that substantiality is "determined by assessing the overall nature of the plaintiff's claims and the nature of the specific events or omissions in the forum, and not by simply adding up the number of contacts").

Nonetheless, the facts of this case are distinguishable from those in *Concesionaria*. The only similarity between *Concesionaria* and this case is the retention of New York counsel. Unlike in *Concesionaria*, the Plaintiff here did not allege any communications occurring in New York between the Plaintiff, or the parties it purports to represent, and Defendant IFC. Even though payments under the Assignment Agreement were made to New York bank accounts, the Plaintiff is not a signatory to the that agreement. In *Concesionaria*, the plaintiff and defendant were both signatories to the relevant agreement. Therefore, the repayment of the loan to Defendant IFC's New York bank account cannot be relied on in the substantiality analysis. Because the Assignment Agreement does not hold the same weight as the loan agreements that gave rise to the cause of action in *Concesionaria*, that case does not support a finding that find venue is proper in New York.

The Plaintiff also cites to a Second Circuit case that found proper venue in the Southern District of New York where two agreements giving rise to the defense in that case were negotiated through communications directed to a party in New York. *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 153 (2d Cir. 2001). In its IFC Opposition, the Plaintiff again

relies on the alleged negotiations that occurred in New York (but which Defendant IFC was not specifically alleged in the Amended Complaints to have taken a part in), and the involvement in and closing of the sale-leaseback transaction in New York (for which neither the Plaintiff, nor the parties it contends to represent, were a part of).  IFC Opp'n. at 10.  As discussed above, this Court does not find that the Plaintiff's vague allegations meet the substantiality requirement with respect to the alleged claims against Defendant IFC.  Therefore, reliance on the finding in that case is also unavailing.

The Court is left to either dismiss the case for improper venue or, "if it be in the interest of justice," to transfer the case to the District Court for the District of Columbia.  *Rodriguez*, 612 F. Supp. 3d at 1376 (quoting 28 U.S.C. § 1406(a)).  The Plaintiff urges the Court to transfer venue because it believes it has properly pleaded its claims and transfer is preferable to dismissal.  IFC Opp'n. at 10.  Regardless, the Court is prohibited, as a procedural matter, from transferring the case because it has already held that it lacks subject matter jurisdiction (*see supra* Section III.A.). *Calzaturificio Guiseppe Garbui S.A.S. v. Dartmouth Outdoor Sports, Inc.*, 435 F. Supp. 1209, 1211 n.6 (S.D.N.Y. 1977) (citations omitted).  The Court will dismiss the Amended Complaint in AP 2 as against Defendant IFC on grounds of improper venue under Rule 12(b)(3).

### C.  <u>Statute of Limitations</u>

The Consolidated Motion asks the Court to find that a three-year statute of limitations applies and has expired on both claims, therefore requiring dismissal under Rule 12(b)(6).  The Plaintiff argues that a six-year limitations period applies, and that the claims were timely filed.  Alternatively, the Plaintiff contends that section 108(a) tolling applies, extending the limitations period to two years after the Petition Date.

### 1.   *The Plaintiff Asserts Legal Claims*

Sections 213 and 214 of the New York Civil Practice Law & Rules ("C.P.L.R.") do not specify the statute of limitations period in which claims of unjust enrichment and aiding and abetting breach of fiduciary duty must be brought.

The Plaintiff improperly assumes that, where New York law does not provide otherwise, the catch-all provision of C.P.L.R. 213(1) applies and prescribes a six-year limitations period. Consolidation Opp'n. at 28.  The Plaintiff's reliance on the Second Circuit's findings in *Golden Pacific* is also misplaced.  *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 518 (2d Cir. 2001) (holding that New York's six-year statute of limitations generally applies for claims of unjust enrichment and breach of fiduciary duty).  Other courts in this circuit have subsequently determined that *Golden Pacific* is controlling only where the plaintiff is seeking equitable relief. *Fezzani v. Bear, Stearns & Co.*, No. 99 Civ 0793, 2004 WL 1781148, at *2 (S.D.N.Y. Aug. 10, 2004) (observing how *Golden Pacific* and the precedent relied on in that decision involved only plaintiffs seeking equitable relief); *see Bascuñan v. Elsaca*, No. 15 Civ. 2009, 2021 WL 3540315, at *6 n.5 (S.D.N.Y. Aug. 11, 2021) (explaining that since *Golden Pacific*, New York appellate courts have been split on the proper statute of limitations period to apply) (citations omitted).

For these causes of action, courts in this Circuit have applied a three-year or six-year limitations period dependent on the substantive remedy sought by the plaintiff.  *Bascuñan*, 2021 WL 3540315, at *6 (unjust enrichment); *Wagley v. JP Morgan Chase Bank, N.A.*, No. 18 Civ. 8668, 2020 WL 5768688, at *5 (S.D.N.Y. Sept. 26, 2020) (aiding and abetting breach of fiduciary duty).  If monetary relief is sought, a three-year statute of limitations applies.  *Bascuñan*, 2021 WL 3540315, at *6 (citations omitted).  If an equitable remedy is sought, a six-year statute of limitations applies.  *Id.*

The parties disagree on the characterization of the Plaintiff's claims.  The Plaintiff's prayer for relief is "restitution in an amount to be determined at trial."  Am. Compl. at 30.  In this circuit, "[t]he 'key factor' in determining whether 'restitution' is legal or equitable 'is whether a claimant was seeking restitution from a defendant's general funds, in which case the claim [is] legal, or whether a claimant was seeking to recover money that could be traced to . . . particular [property] held by a defendant, in which case the claim [is] equitable.'"  *Severstal Wheeling, Inc. Ret. Comm. v. WHX Corp.*, 659 F. App'x 28, 31 (2d Cir. 2016) (quoting *Cent. States, Se. & Sw. Areas Health & Welfare Fund v. Gerber Life Ins. Co.*, 771 F.3d 150, 155 (2d Cir. 2014)).

In looking beyond the Plaintiff's use of the term "restitution" and focusing on the substance of the claims, it is evident "that what the Plaintiff actually seeks is money damages." *Bascuñan*, 2021 WL 3540315, at *7 (holding that based on the history of the litigation, the plaintiff's unjust enrichment claim seeking an "order requiring the return of all funds misappropriated by the defendants" was a claim for money damages, implying a three-year statute of limitations).

Specifically, the Plaintiff seeks to recover "more than $465 million that [the] Defendants unlawfully obtained at [the] creditors' expense." Am. Compl. ¶ 1.  In its Consolidated Opposition, the Plaintiff states that the Defendants ultimately obtained "over $780 million from the sale of the two rigs, while plunging the [Schahin Group] into bankruptcy."  Consolidated Opp'n. at 2.  The monetary figures expressed by the Plaintiff merely refer to the amount that the Defendants loaned to the Schahin Group for construction of the Oil Rigs and were later repaid under the Assignment Agreement. Am. Compl. ¶ 44.  Such prayer for relief does not concern a particular fund or property held by any of the Defendants.  If these proceedings were to advance to trial and the Plaintiff

obtained a favorable outcome, the money owed by the Defendants would be paid from the Defendants' general funds, effectively characterizing the causes of actions as legal claims.

The Plaintiff also uses the term "disgorgement" in its pleadings, which would render the tracing requirement inapplicable, but this does not change the Court's opinion on the nature of the Plaintiff's claims. *Lia v. Saporito*, 541 F. App'x 71, 75 (2d Cir. 2013) (citing to the First Department's decision that "[t]he calculated use of the term 'disgorgement' instead of other equally applicable terms such as repayment, recoupment, refund, or reimbursement, should not be permitted to distort the nature of [the] claim so as to expand the applicable limitations period from three years to six"); *Cent. States*, 771 F.3d at 155 (finding that, although styled as "disgorgement," legal claims were at issue where the plaintiff was seeking fungible dollars out of the defendants' general funds). Further, "disgorgement is a distinctly public-regarding remedy, available only to government entities seeking to enforce explicit statutory provisions." *F.T.C. v. Bronson Partners, LLC*, 654 F.3d 359, 372 (2d Cir. 2011). Therefore, the Plaintiff's attempt to fashion their request for relief as disgorgement is also misguided.

The Court finds that the Plaintiff is seeking monetary damages, thereby classifying both claims as legal claims, and requiring the application of a three-year limitations period.

### 2. Time Began to Run in 2014

"The three-year statute of limitations 'begins to run upon the occurrence of the wrongful act giving rise to the duty of restitution.'" *Bascuñan*, 2021 WL 3540315, at *7 (quoting *Martin Hilti Family Tr. v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 430, 466 (S.D.N.Y. 2015)). As the Plaintiff makes clear, and as the Court found above, the basis of the claims is when the Defendants participated in the sale-leaseback transaction and obtained repayment of their loans. Therefore,

the Defendants contend the wrongful act on which the limitations period is based is the occurrence of the sale-leaseback transaction on September 12, 2014. The Court agrees.

The Plaintiff asks the Court to instead look to "the time that the wrongful act first injured the [P]laintiff." Consolidated Opp'n. at 31. It asserts that the conversion of the reorganization to bankruptcy in the Brazilian bankruptcy court in March 2018 is when the injury to the creditors solidified.[9] The Plaintiff argues that "the limitations period began running 'only when the enrichment actually bec[ame] unlawful,'" which in this case, would be the Schahin Group's conversion to bankruptcy, indicating that the group "gave up its efforts to pay its creditors." *Id.* at 32. The Plaintiff cites to several cases, all of which concern equitable claims that impose a six-year limitations period. *Id.*

The Court is not convinced by this argument because the accrual date of the Plaintiff's claims would be inconsistent with the date of the event on which the Plaintiff bases its claims. Even though damages may have become "certain" upon the Schahin Group's failure to reorganize and conversion to bankruptcy, the "wrongful act" is nonetheless the closing of the sale-leaseback transaction. *See Aviles v. S&P Global, Inc.*, 380 F. Supp. 3d 221, 276 (S.D.N.Y. 2019) (explaining that although damages became clear when refinancing efforts had failed, this did not speak to the timeliness of the plaintiff's injury and accrual of claims, but rather simply when the plaintiffs became aware of the ability to bring such claims).

---

[9] The parties' experts hold opposing views as to whether any Brazilian law applies and the time at which the creditors that the Plaintiff purports to bring claims on behalf of could have brought a claim. The Plaintiff's expert expressed that the claims at hand were not actionable until the Schahin Group entered bankruptcy in 2018. Satiro Decl. at 9. The Defendants' expert disagrees, explaining that the creditors would not have needed to wait until 2018, and instead could have brought a claim upon the occurrence of the sale lease-back transaction in September 2014. Figueiredo Decl. at 9. Both of these views are based on claims actionable under Brazilian law, however, the Plaintiff does not assert violation of any applicable Brazilian statutes in the Amended Complaint, besides brief reference to Brazilian establishment rules. Am. Compl. ¶¶ 109–113. For this reason, the Court will look only to the caselaw regarding New York law in making its determination.

Nor did the Plaintiff allege any other wrongful act by the Defendants after the sale-leaseback and repayment of the loans.  Therefore, the Court finds that the limitations period began to run in September 2014.  The Plaintiff would have had to bring its claims by September 2017, which is nearly four years before this action was filed on July 13, 2021.[10]  Thus, the applicable statute of limitations for the claims had expired prior to the date of the filing of the Amended Complaints.[11]

### 3.   Section 108(a) is Inapplicable

Section 108(a) of the Bankruptcy Code states that "[i]f applicable nonbankruptcy law . . . fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of" the end of such period or two years after the order for relief.  In cases where a trustee is appointed, the trustee also gets the benefit of section 108(a) tolling.  *In re Fairfield Sentry Ltd.*, 452 B.R. 52, 58 (Bankr. S.D.N.Y. 2011).  This provides the "trustee additional time, upon stepping into the shoes of the debtor, to discover and evaluate potential causes of action or perform other acts required to preserve the debtor's rights."  *Id.*

As noted by Judge Glenn in *Norske Skogindustrier*, section 108(a)'s tolling provision is incorporated into Chapter 15 cases, as provided by section 103(a) of the Bankruptcy Code.  *Bankr. Estate of Norske Skogindustrier ASA v. Cyrus Capital Partners, L.P. (In re Bankr. Estate of Norske Skogindustrier ASA)*, 629 B.R. 717, 739 (Bankr. S.D.N.Y. 2021) (citing *Fairfield Sentry*, 452 B.R.

---

[10] The Original Complaints were filed on July 13, 2021.  The Amended Complaints were filed on November 12, 2021.  The Amended Complaints, however, relate back to the filing of the Original Complaints because they arise "out of the conduct, transaction, or occurrence set out . . . in the original pleading."  Fed. R. Civ. P. 15(c)(1).  For the purposes of the statute of limitations analysis, the Court uses July 13, 2021 as the filing date.

[11] The Court notes that even if the date of conversion to bankruptcy was when claims began to accrue, the claims would still be untimely because the three-year limitations period would have expired in March 2021.

at 61).  The term "trustee" has been interpreted broadly to encompass foreign representatives in Chapter 15 cases.  *Fairfield Sentry*, 452 B.R. at 59–60.

The parties dispute whether section 108(a) applies to claims brought on behalf of creditors. The Plaintiff relies on caselaw and an analysis of the term "debtor" to suggests that it does.  Sur-Reply at 2–7.  The Defendants argue that the language of the statute is clear, applying only to claims that could be brought by the "debtor."  Sur-Sur-Reply at 6–9.  Because the Plaintiff concedes it is acting on behalf of and for the benefit of creditors of the Schahin Group (Am. Compl. ¶ 100), the Defendants assert that the Plaintiff cannot reap the benefit of section 108(a) tolling.  *Id.*

The Plaintiff primarily relies on two cases, as mentioned at the Hearing and in its post-hearing briefing.  First, *Lippe*, where Judge Chin found that section 108(a) applied to fraudulent conveyance and avoidance claims brought on behalf of creditors.  *Lippe v. Bairnco Corp.*, 225 B.R. 846, 853 (S.D.N.Y. 1998).  Second, *Massa Falida*, where Chief Judge Isicoff found that section 108(a) applied to claims brought by a trustee who represented both the Brazilian debtor and its creditors.  *Laspro Consultores LTDA v. Alinia Corp. (In re Massa Falida Do Banco Cruzeiro Do Sul S.A.)*, 567 B.R. 212, 228 (Bankr. S.D. Fla. 2017).

In *Lippe*, fraudulent conveyance claims were brought pursuant to section 544(b) of the Bankruptcy Code and New York Debtor and Creditor Law.  *Lippe*, 225 B.R. at 851.  Even though the applicable nonbankruptcy law was New York state law, the language of section 544(b) clearly distinguishes the case at hand by only applying to claims that could be brought by "an actual unsecured *creditor*."  *Id.* at 852 (emphasis added) (citing *In re Wingspread Corp.*, 178 B.R. 938, 945 (S.D.N.Y. 1995)).  Section 108(a) specifically applies to claims that could be brought by the *debtor*.

The Defendants urge the Court to find that the brief reference to section 108(a) in *Lippe* was improper and inapplicable here.[11]   Sur-Sur-Reply at 13–14 ("As *Collier* explains in its discussion of section 108(a): 'It is important to note . . . that periods of limitation for causes of action arising under the Code are separately governed by sections 546(a), 549(d) and 550(e).'"). "One of the causes of action that are not included within the provisions of Code § 108(a) is an action that could be brought by a creditor for the benefit of the estate, such as a fraudulent transfer action under state law."  1 Norton Bankr. L & Prac. 3d § 16:1.  The Court agrees that *Lippe* is not compelling here.[12]

The language of section 108(a) is clear.  The two-year tolling period applies only to claims that could be brought by the *debtor*.  The legislative history supports this reading.  "Subsections (a) and (b) . . . permit the trustee, when he steps into the shoes of the debtor, an extension of time for filing an action or doing some other act that is required to preserve the debtor's rights. . . . Subsection (c) extends the statute of limitations for creditors.  Thus, if a creditor is stayed from commencing or continuing an action against the debtor because of the bankruptcy case, then the creditor is permitted an additional 30 days after notice of the event by which the stay is terminated." S. Rep. No. 95-989, at *30 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787, 5816.

---

[11] The Defendants also cite to several cases that indicate section 108(a) cannot be used in conjunction with fraudulent conveyance claims arising under section 544(b) and the respective state law.  Sur-Sur-Reply at 13 (citing *Barr v. Charterhouse Grp. Int'l, Inc. (In re Everfresh Beverages, Inc.)*, 238 B.R. 558, 572–73 (Bankr. S.D.N.Y. 1999); *Hirsch v. Harper (In re Colonial Realty Co.)*, 168 B.R. 512, 516–17 (Bankr. D. Conn. 1994); *Sears Petroleum & Transp. Corp. v. Burgess Constr. Servs., Inc.*, 417 F. Supp. 2d 212, 224 (D. Mass. 2006); *In re Revco D.S., Inc.*, 118 B.R. 468, 499 (Bankr. N.D. Ohio 1990)).

[12] The Plaintiff points out that *Lippe* was affirmed by the Second Circuit.  *See Lippe v. Bairnco*, 99 F. App'x 274 (2d Cir. 2004).  However, the court there explicitly stated that it "need not reach the issue of whether the plaintiffs can satisfy the statute of limitations."  *Id.* at 285.

The term "debtor" cannot be expansively interpreted, as the Plaintiff suggests, to also include "creditors." Sur-Reply at 5.[13] To do so would evade the decades of case law analyzing the language of the Bankruptcy Code as it pertains to "debtors" and "creditors." Because the Plaintiff is pursuing these claims on behalf of and for the benefit of creditors of the Schahin Group, and not on behalf of the Debtors, it cannot apply the tolling available under section 108(a).

Even if section 108(a) was available to the Plaintiff in this case, the Court finds that the tolling cannot apply because the period for which the claims could have been brought expired before the Petition Date. The former judicial administrator filed the Chapter 15 petition on July 26, 2019 before the Florida Court. As determined above, the statute of limitations for the Plaintiff's causes of action expired in September 2017. Because the claims were no longer timely as of the Petition Date, the additional two years granted under section 108(a) could not be made available to the Plaintiff.

The Court finds that the Defendants have met their burden of showing that the three-year limitations period has expired and that section 108(a) tolling is inapplicable. The Court will dismiss the Amended Complaints as untimely under Rule 12(b)(6).

### D. **Standing**

The Consolidated Motion seeks dismissal pursuant to Rule 12(b)(1) for lack of standing. Specifically, the Defendants assert lack of Article III standing and prudential standing.

---

[13] To the extent that the *Massa Falida* case interprets section 108(a) to apply to the Brazilian trustee acting on behalf the debtor and the creditors of the debtor's estate, the Court finds the case to be distinguishable since here the Plaintiff is bringing the causes of action on behalf of creditors and not on behalf of a debtor or its estate. Am. Compl. ¶ 1; Consolidated Opp'n. at 13-14; Satiro Decl. § 4.b.i. To the extent that the *Massa Falida* case applies section 108(a) to causes of action that could only be brought on behalf of creditors, the Court disagrees with such interpretation.

### 1. *Article III Standing*

To establish the required Article III standing, the Plaintiff must demonstrate: "(1) an 'injury in fact' that is (2) fairly traceable to the challenged action of the defendant and is (3) likely to be redressed by a favorable decision." *Anderson v. Credit One Bank, N.A. (In re Anderson)*, 641 B.R. 1, 54 (Bankr. S.D.N.Y. 2022) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). The parties dispute whether the Defendants' participation in the sale-leaseback transaction harmed a legally protected interest of the creditors of the Schahin Group, who the Plaintiff represents. Therefore, the "injury in fact" prong of the analysis is at issue.

An "injury in fact" must be an injury of a concrete and particularized legally protected interest. *Lujan*, 504 U.S. at 560. The Plaintiff's argument for standing hinges on the contention that the Schahin Group operates as a "single economic entity" and that the sale-leaseback transaction plunged the Debtors into bankruptcy, thereby causing injury to all of its creditors. Consolidated Opp'n. at 9, 11. It asserts that the creditors were legally entitled to funds received from the sale-leaseback transaction that were instead paid to the Defendants, and that the deprivation of such money is "classic injury-in-fact." *Id.* at 9 (citing *Porsch v. LLR, Inc.*, 380 F. Supp. 3d 418, 424 (S.D.N.Y. 2019)).

The Defendants assert that, based on the attenuated relationship between the parties, the other creditors of the Debtors could not have suffered an "injury in fact." Consolidated Mot. at 14. The Defendants suggest that the Plaintiff would have to allege and obtain a finding of piercing the corporate veil such that the assets of the non-debtor borrowers could be brought into the Debtors' estate. *Id.* at 15–16. The Plaintiff has not done so. *Id.* at 15. Without such finding, the Defendants contend that the Plaintiff cannot assert legal entitlement of the Debtors' creditors to the assets of the non-debtor borrowers. *Id.* at 18.

The Court agrees with the Defendants that the relationship between the relevant parties is too attenuated to proffer a finding of "injury in fact" to the creditors represented by the Plaintiff. The only connection between the non-debtor borrowers and the Debtors is their common owners, the Schahin brothers.  The Plaintiff's allegation that the Schahin Group operates as a "single economic entity" is conclusory in nature and cannot establish legal entitlement of the Plaintiff, nor the Debtors' creditors, to the assets of the non-debtor borrowers.  *Zanotti v. Invention Submission Corp.*, No. 18-cv-5893, 2020 WL 2857304, at *8 (S.D.N.Y. June 2, 2020) (finding the causal connection too weak where it is based on "hypothetical, conclusory, and implausible assertions of a 'grand scheme'").  The Plaintiff does not allege any other source of the creditors' legal entitlement to the proceeds of the sale-leaseback transaction, and therefore fails to satisfy the first prong.

Accordingly, the Plaintiff lacks Article III standing to bring suit against the Defendants and the Court will dismiss the claims under Rule 12(b)(1).

### 2. *Prudential Standing*

The Second Circuit also employs a prudential standing rule, known as the *Wagoner* rule, which provides that "when a bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damage to the creditors." *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991).  The typical situation is when agents of the bankrupt corporation partake in the alleged wrongdoing and such wrongdoing is imputed to the corporation and the trustee.  *Giddens v. D.H. Blair & Co. (In re A.R. Baron & Co.)*, 280 B.R. 794, 800 (Bankr. S.D.N.Y. 2002).  The Defendants contend that the Plaintiff has repeatedly alleged facts for the classic application of the *Wagoner* rule.  Consolidated Mot. at 19.  The Court agrees.

In *Giddens*, the court found that the *Wagoner* rule applied where "the amended complaint implicate[d] [the bankrupt corporation's] management in the alleged fraud." *Giddens*, 280 B.R. at 801. Here, the Plaintiff alleges that "[t]he Schahin Group's lead negotiators in the sale-leaseback transaction were Eonio Rocha and Gustavo Shinohara," who were CEO and CFO of certain Schahin Group entities, one of which is a Debtor in the pending bankruptcy proceedings. Am. Compl. ¶ 70. Rocha and Shinohara were granted powers of attorney with respect to the sale-leaseback transaction by the Schahin brothers, the founders of the Schahin Group. Am. Compl. ¶ 111. Based on the grant of power and the allegation that these actors then "knowingly sold the [Oil Rigs] for substantially less than their appraised value," such alleged wrongdoing of these officers must be imputed to the bankrupt entities. Am. Compl. ¶ 128. The Plaintiff, as Judicial Administrator and foreign representative of the Debtors (which include the entity that Rocha and Shinohara were officers of), is precluded from bringing suit against the Defendants pursuant to the *Wagoner* rule.[14]

The Plaintiff attempts to avoid application of the Wagoner rule by emphasizing that it "represents the interests of the Schahin Group's innocent creditors, not the company itself." Consolidated Opp'n. at 14 (citing Am. Compl. ¶ 100). The court in *Wagoner* did not inquire into whether a trustee may sue a third party on behalf of the bankrupt debtor's creditors. *Wagoner*, 944 F.2d at 118. However, subsequent case law has established that, under the *Wagoner* rule, "[a] trustee does not have standing to pursue claims on behalf of the debtor estate's creditors." *Giddens*

---

[14] *Giddens* also explained that "unless a complaint alleges the existence of an innocent decisionmaker who could have prevented the fraud, the wrongdoing will be imputed to the corporation." *Giddens*, 280 B.R. at 801 (citing *Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld LLP*, 212 B.R. 34, 36 (S.D.N.Y. 1997)). Without such allegations, a court could properly find "cooperation of management" as required under *Wagoner*. *Giddens*, 280 B.R. at 800. Here, the Amended Complaint alleges that the Schahin brothers were responsible for granting Rocha and Shinohara powers of attorney to act in the sale-leaseback transaction. The Plaintiff's assertion that it cannot be charged with the management's misconduct (Consolidated Opp'n. at 15) is conclusory and unconvincing as the Court has not been presented with any other allegations that would otherwise prohibit the wrongdoing from being imputed to the Plaintiff.

*v. D.H. Blair & Co. (In re A.R. Baron & Co.)*, 280 B.R. 794, 799 (Bankr. S.D.N.Y. 2002) (citing

*Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 434 (1972)).  "[W]hen creditors . . .

have a claim for injury that is particularized as to them, they are exclusively entitled to pursue that

claim, and the bankruptcy trustee is precluded from doing so."  *Hirsch v. Arthur Anderson & Co.*,

72 F.3d 1085, 1093 (2d Cir. 1995).

The Amended Complaint recognizes that the Defendants here are Schahin Group creditors

themselves, and that their alleged wrongdoing benefitted the Defendants "at the expense of the

Schahin Group's *other* creditors."  Am. Compl. ¶ 124 (emphasis added).  Therefore, the alleged

injury is specific to the "Schahin Group's other creditors" and those other creditors are

"exclusively entitled to pursue [those] claim[s]."  *Hirsch*, 72 F.3d at 1093.  The Plaintiff does not

allege any distinction between the injury to these creditors and the injury to the Debtors, besides

the sale-leaseback transaction being a factor in the Debtors' bankruptcy, that would permit it to

bring suit against the Defendants.  *Id.* at 1090–91 (citing *Hirsch v. Arthur Anderson & Co.*, 178

B.R. 40, 43 (D. Conn. 1994)).  Therefore, absent another basis for standing, the Plaintiff lacks

prudential standing to pursue the unjust enrichment cause of action.  *Picard v. Taylor (In re Park

S. Sec., LLC)*, 326 B.R. 505, 514 (Bankr. S.D.N.Y. 2005) (applying the *Wagoner* rule where

defendants were allegedly "unjustly enriched at the expense not of the Debtor but, rather, of the

[creditors] whose accounts [were] depleted").

The Second Circuit has also held that claims such as aiding and abetting breach of fiduciary

duty "belong to the creditors *qua* creditors."  *Mediators, Inc. v. Manney (In re Mediators, Inc.)*,

105 F.3d 822, 826 (2d Cir. 1996) (finding that even the creditors committee could not bring these

claims on behalf of creditors because the claims belonged to the individual creditors themselves).

Therefore, the Plaintiff cannot purport to bring a claim for aiding and abetting breach of fiduciary

duty on behalf of injured creditors because such claim accrues to the individual creditors themselves. *Mediators*, 105 F.3d at 825 (citing *Wagoner*, 944 F.2d at 120). The Plaintiff lacks prudential standing to pursue the aiding and abetting breach of fiduciary duty cause of action.

In a final effort, the Plaintiff asks the Court to find that *Wagoner* is inapplicable because the Plaintiff gets its authority to bring these claims from outside the Bankruptcy Code—it gets its authority from Brazilian law. Hr'g Tr. 92:7-93:5. The Plaintiff relies on Judge Grossman's decision that held the *Wagoner* rule inapplicable where the plaintiff, as foreign representative, had the authority through an assignment of claims to pursue certain claims on behalf of creditors. *BC Liquidating, LLC v. Weinstein (In re BC Funding, LLC)*, 519 B.R. 394 (Bankr. E.D.N.Y. 2014) (declining to impute the bad acts of the debtor's management to the plaintiff because an assignment of the claims existed and provided the trustee with authority to bring such claims). The Plaintiff equates this "separate authority" to the powers conferred upon the Plaintiff under Brazilian law.

However, the Plaintiff's reliance on this case is misconceived. The estate representative's power to pursue certain causes of actions in *BC Liquidating* derived from an assignment provision included in the debtor's plan of reorganization. *Id.* at 410. This plan was confirmed pursuant the Bankruptcy Code, and therefore, is not a "separate authority" in the way that the Plaintiff suggests. The Court declines to extend the rationale in *BC Liquidating* to the facts here.

The Plaintiff, as a foreign representative of the Debtors, is granted the same relief available to the trustee under the Bankruptcy Code, including the ability to bring suit and be sued. *See Hosking v. Hellas Telcoms. (Lux.) II SCA (In re Hellas Telcoms. (Lux.) II SCA)*, 524 B.R. 488, 530 (Bankr. S.D.N.Y. 2015). Because of this grant, the *Wagoner* rule as applied to trustees must also apply to the Plaintiff in this case. *Id.*

The Court finds that the *Wagoner* rule applies, and the Plaintiff lacks prudential standing to bring suit against the Defendants.  The Court will dismiss the claims for lack of standing under Rule 12(b)(6).

### E.  **Personal Jurisdiction**

The Defendants also ask the Court to dismiss the Amended Complaints pursuant to Rule 12(b)(2) because the Plaintiff failed to plead personal jurisdiction over nineteen of the Defendants (the "Jurisdictional Objectors").[15]  The Plaintiff does not contest that the Court lacks general jurisdiction over the Jurisdictional Objectors.  Rather, the parties dispute whether the Defendants have consented to personal jurisdiction in New York based on the forum selection clauses and choice of law provisions in the Loan Agreements, and whether the Plaintiff has otherwise properly plead the requirements of specific jurisdiction.

#### 1.  *Consent*

The Plaintiff correctly asserts that "consent to a forum selection clause waives a party's right to object to personal jurisdiction."  Consolidated Opp'n. at 34.  However, the Court reiterates its holding above (*see supra* Section III.A.2) in finding that because the Plaintiff is not a signatory to the respective Loan Agreements, and because the facts here are distinguishable from *Magi XXI*, the Plaintiff cannot rely on the forum selection clauses and choice of law provisions to establish personal jurisdiction over the Jurisdictional Objectors.

---

[15] The Jurisdictional Objectors include AP 1 Defendants: Banco Bilbao Vizcaya, Argentaria, S.A.; Banco Bilbao Vizcaya Argentaria, S.A., Grand Cayman Branch; Caterpillar Financial Services Corporation; Credit Industriel et Commercial; Deutsche Bank AG, London Branch; Hamburg Commercial Bank AG; Intesa Sanpaolo, S.p.A., New York Branch; Itau BBA International PLC; Mitsubishi Corporation; Mizuho Bank, Ltd.; MS Drillship I S.A.; Shinhan Bank; Standard Chartered Bank; UniCredit Bank AG; and AP 2 Defendants: Bank of China; China Development Bank; Dexia Credit Local SA; IFC; and KfW.  Perry Decl., Ex. C.

### 2. *Specific Jurisdiction*

For this Court to exercise specific personal jurisdiction over the Defendants, there "must [be] sufficient 'minimum contacts' with the forum 'such that the maintenance of the suit does not offend the traditional notions of fair play and substantial justice.'" *Motors Liquid. Co. Avoidance Action Trust v. JP Morgan Chase Bank (In re Motors Liquid. Co.)*, 565 B.R. 275, 285 (Bankr. S.D.N.Y. 2017) (citations omitted). The Plaintiff must establish sufficient contacts, such "that the defendant purposefully availed [it]self of the privilege of doing business in the forum state and that the defendant could foresee being haled into court there." *Id.* Further, "the underlying cause of action must arise out of or relate to that contact." *Id.* at 286 (citations omitted). Under New York's long-arm statute, "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state." C.P.L.R. 302(a)(1).

The Defendants assert that the "Plaintiff can only point to two specific ties between the Jurisdictional Objectors and the forum, which are neither individually nor collectively sufficient." Consolidated Mot. at 31. However, C.P.L.R. 302(a)(1) is a "single act statute" such that "proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities [in New York] were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Nationsbank, N.A. v. Macoil (In re Med-Atlantic Petroleum Corp.)*, 233 B.R. 644, 657 (Bankr. S.D.N.Y. 1999) (quoting *Kreutter v. McFadden Oil Corp.*, 527 N.Y.S.2d 195, 198–99 (1988)). Therefore, the closing of the sale-leaseback having occurred in New York and subsequent payment to New York bank accounts could be sufficient to find personal jurisdiction, even though the Jurisdictional Objectors (with the exception of the Mitsubishi Defendants) never entered New York. *In re Motors Liquid.*,

565 B.R. at 286 (citing *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 169 (2d Cir. 2010)).

To determine whether the contact with the forum was purposeful and whether there was a substantial relationship between the acts and claims asserted, "[c]ourts look to the totality of the circumstances . . . and consider . . . whether a defendant has an ongoing contractual relationship with a New York corporation, whether the contract contains New York choice of law, forum selection, consent to jurisdiction clauses, and the place of payment." *In re Motors Liquid.*, 565 B.R. at 286 (citing *ESI Inc. v. Coastal Corp.*, 61 F. Supp. 2d 35, 57–59 (S.D.N.Y. 1999)). "[Where the putative transaction is use of a correspondent bank account, 'the frequency and deliberate nature of [the defendant's] use of its correspondent account[s] [may] be determinative' of whether that use was intentional." *Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 130 (2d Cir. 2022) (citing *Licci v. Lebanese Canadian Bank ("Licci II")*, 732 F.3d 161, 168 (2d Cir. 2013)).

The New York Court of Appeals, after certification of two questions from the Second Circuit, found "purposeful availment" where the complaint alleged a foreign bank's repeated use of a correspondent account in New York" which effectively established a "course of dealing." *Licci v. Lebanese Can. Bank, SAL ("Licci III")*, 20 N.Y.3d 327, 339 (N.Y. 2012). In that case, there were over dozens of wire transfers executed through a New York bank account, which "indicate[d] desirability and a lack of coincidence." *Licci III*, 20 N.Y.3d at 340. Similarly, in *Daou*, the court found purposeful availment where the defendants concededly "use[d] New York correspondent accounts on a regular basis to move USD deposits in and out of Lebanon." 42 F.4th at 130.

The Plaintiff here merely alleges two uses of the New York bank accounts: the initial financing by the Defendant Assigning Lenders for the construction of the Oil Rigs (Am. Compl. ¶

47) and repayment of those same loans following the sale-leaseback transaction (Am. Compl. ¶¶ 80, 81). The Court is not persuaded by the Plaintiff's conclusory statement that the "Defendants exploited the New York financing market." Consolidated Opp'n. at 37. "The Jurisdictional Objectors are international financial institutions with principal places of business in jurisdictions across the world, including China, Japan, South Korea, the United Kingdom, Italy, France, Spain, Germany, Grand Cayman, Brazil, and Washington D.C." Consolidated Mot. at 30 (citing *AP 1* [Am. Compl. ¶¶ 13–29]; *AP 2* [Am. Compl. ¶ 19]). The Plaintiffs allegations do not persuade the Court that use of New York bank accounts for the sale-leaseback transaction amount to purposeful availment. Similar to points that the Court has already made (*see supra* pp. 27–29), the remaining allegations of negotiations in New York are vague as to the Jurisdictional Objectors, except with regard to Defendants Mizuho Bank and Nomura.

Without more than the isolated use of New York bank accounts, and without being a counterparty to the agreements containing forum selection clauses and choice of law provisions, the Amended Complaints do not sufficiently establish the Jurisdictional Objectors' purposeful availment of the forum. Because the Plaintiff fails to satisfy the first prong of this analysis, the Court will not address the relationship between the transaction and the claim.

The Court acknowledges that two Jurisdictional Objectors did not receive payment in New York bank accounts: Bank of China and China Development Bank. *AP 2* [Am. Compl. ¶ 63]. However, personal jurisdiction does not exist over these Defendants either. Similar to the analysis above (*see supra* p. 34), the Plaintiff fails to allege specifically any contact that Defendants Bank of China and China Development Bank had with the forum.

The Court concludes that the Plaintiff did not meet its burden in making a prima facie showing of personal jurisdiction over the Jurisdictional Objectors. Therefore, the Court will

dismiss the Amended Complaints as against the Jurisdictional Objectors for lack of personal jurisdiction under Rule 12(b)(2).

### F. <u>Failure to State a Claim</u>

Lastly, the Defendants seek dismissal under Rule 12(b)(6) for the Plaintiff's failure to state its unjust enrichment and aiding and abetting breach of fiduciary duty claims. The Plaintiff asserts that it has properly plead the essential elements of both claims.

#### 1. *Unjust Enrichment*

Under New York law, a claim for unjust enrichment requires showing that: "the defendant was enriched, at the plaintiff's expense, and that equity and good conscience militate against permitting the defendant to retain what the plaintiff seeks to recover." *Tutor Perini Bldg. Corp. v. Port Auth. (In re George Washington Bridge Bus Station Dev. Venture LLC)*, No. 21-01187, 2022 Bankr. LEXIS 2752, at *28–29 (Bankr. S.D.N.Y. Sept. 30, 2022) (citations omitted). The Plaintiff contends that the Defendants were enriched upon receiving the proceeds of the sale-leaseback transaction as repayment of their loans, and that this was done at the expense of the Schahin Group's other creditors. Consolidated Opp'n. at 21. The Plaintiff purports that the Defendants knew this was an unlawful transaction in light of alleged self-dealing of Schahin Group executives and relevant Brazilian law,[16] such that "it is against equity and good conscience to permit Defendants to retain the sale proceeds." *Id.* at 22.

The Defendants argue that *Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.* is directly on point. 599 N.Y.S.2d 816 (App. Div. 1993). There, Ultramar agreed to sell oil to Drexel and

---

[16] The Plaintiff argues that the sale-leaseback transaction amounts to wrongful conduct under Brazilian law, triggering the Brazilian establishment sale rules. Consolidated Opp'n. at 26–28. The Court will not address this argument because the Plaintiff has not asserted a cause of action arising under Brazilian law.

receive payment after the delivery.  *Id.* at 818.  Drexel became insolvent shortly after and filed for bankruptcy.  *Id.*  During the same time as the Ultramar transaction, Chase made loan advances to Drexel, and Drexel assigned account receivables to Chase as security for the loans.  *Id.*  When Chase's debt was later repaid with these account receivables, Ultramar claimed it was inequitable for Chase to accept these proceeds in light of its own debt owed by Drexel.  *Id.*

The First Department in *Ultramar* held that "[e]ven though insolvent, a debtor may properly assign assets to a creditor as security for an antecedent debt although the effect of the transfer will be to prefer that creditor."  *Id.* at 819.  Therefore, the assignment and transfer of the accounts receivables to Chase "satisife[d] an antecedent debt" and "was neither fraudulent nor otherwise improper."  *Id.*  It was also of no consequence "that the transferee ha[d] knowledge of [the debtor's] insolvency."  *Id.*  The court found that the plaintiff, in seeking restitution, "ha[d] never argued that it had any right to or interest in the accounts receivable in question."  *Id.*  The court reversed the lower court's order denying the motion to dismiss.  *Id.* at 820.

The Court agrees that the facts of the present case are strikingly similar to those in *Ultramar*.  While the Plaintiff is correct in its contention that *Ultramar* did not include independent allegations of a wrongful transaction, the Court is not persuaded by the Plaintiff's attempt to distinguish the case as it has already determined that the Plaintiff has not alleged how the creditors it purports to represent hold a superior, legal entitlement to the sale-leaseback proceeds.  *See supra* Section III.D.1; *see Hughes v. BCI Int'l Holdings, Inc.*, 452 F. Supp. 2d 290, 304 (S.D.N.Y. 2006) (holding that only if the defendants wrongfully obtained assets that were specifically intended for a third party, then would the unjust enrichment claim survive the motion to dismiss).  The alleged enrichment, therefore, could not be at the Plaintiff's expense.

Here, the non-debtor borrowers owed a valid debt to the Defendants under the Loan Agreements.  The use of the sale-leaseback proceeds to repay this debt, without further allegations that the other Schahin Group creditors were also somehow entitled to these funds, is not unjust enrichment.  Even if the Defendants were enriched, "the New York Court of Appeals has held that a plaintiff cannot recover under an unjust enrichment theory where the plaintiff did not pay the [money] in question."  *Mueller v. Michael Janssen Gallery PTE. Ltd.*, 225 F. Supp. 3d 201, 209 (S.D.N.Y. 2016) (citing cases).

Therefore, the Plaintiff has not stated a claim for unjust enrichment.  The Court will dismiss this claim against the Defendants for failure to state a claim under Rule 12(b)(6).

### 2.   *Aiding and Abetting Breach of Fiduciary Duty*

To state a claim for aiding and abetting breach of fiduciary duty, the Plaintiff must plead: "(1) a breach of fiduciary obligations, of which the aider and abettor had actual knowledge; (2) the defendant knowingly induced or participated in the breach; and (3) the plaintiff suffered damages as a result of the breach."  *In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 563 (Bankr. S.D.N.Y. 2016) (citing *In re Sharp Int'l Corp.*, 403 F.3d 43 49–50 (2d Cir. 2005)).

First, the Court finds that the Plaintiff has not alleged adequate breach of fiduciary obligations.  The Defendants argue that the Amended Complaint merely alleges that Schahin Group executives Rocha and Shinohara owed fiduciary duties to the Schahin Group and its creditors.  Consolidated Mot. at 26.  The Plaintiff contends such allegation is properly indicative of its claim.  Consolidated Opp'n. at 16.

This allegation is insufficient, however, in the context of the sale-leaseback transaction.  An allegedly knowing authorization of the sale of the Oil Rigs for less than fair value would violate

fiduciary duties owed to creditors of the entities that owned the Oil Rigs: Baerfield and Soratu. This is a vital distinction that the Plaintiff fails to acknowledge.  These entities are not part of the Schahin Group entities that are currently Debtors in bankruptcy, and therefore, their creditors are not currently represented by the Plaintiff.  The Plaintiff cannot apply the fiduciary duties owed specifically to creditors of Baerfield and Soratu, to the creditors of the Schahin Group entities as a whole.[17]  The creditors that the Plaintiff represents are not owed fiduciary duties in relation to the sale-leaseback under New York law.

The Plaintiff also has failed to show the Defendants' actual knowledge of the alleged breach.  "[T]he burden of demonstrating actual knowledge, although not insurmountable, is nevertheless a heavy one."  *Chemtex, LLC v. St. Anthony Enters.*, 490 F. Supp. 2d 536, 549 (S.D.N.Y. 2007).  Here, the Plaintiff states that "by no later than June 2015 [the] Defendants knew that Rocha and Shinohara were using insider information against their former employer."  Am. Compl. ¶ 131; *see also* ¶ 97.  This, however, is insufficient as it is nine months after the sale-leaseback closing and not contemporaneous with the alleged breach.  The Plaintiff does at least assert that, based on their status as financiers, the Defendants knew the true value of the Oil Rigs and therefore, knew they were being sold for less than their true value.  Am. Compl. ¶ 129; Consolidated Opp'n. at 19.  Nonetheless, this allegation is wholly conclusory and without any support, is not enough to give rise to an inference that the Defendants were aware of the alleged breach of fiduciary duty.  *See Boyarsky v. Hoberman (In re Jeweled Objects LLC)*, 2012 Bankr. LEXIS 3877, at *28–29 (Bankr. S.D.N.Y. Aug. 22, 2012) (finding conclusory statements

---

[17] The Plaintiff again relies on the conclusory statement that "the Schahin Group operated as a single unit" and the contention that "[t]he two oil rigs were 'establishment' assets critical to the entire Schahin Group enterprise." Consolidated Opp'n. at 17.  However, this argument fails, especially without any finding of piercing the corporate veil.  *See supra* p. 46.  The "establishment law" argument is based off Brazilian law and is not asserted as a cause of action in the Amended Complaints.  The Court is not inclined to give weight to this argument either.

insufficient to establish the actual knowledge requirement).  The Amended Complaint fails with respect to the first element of the aiding and abetting breach of fiduciary claim.

Further, the Court finds that the Plaintiff has failed to show the required inducement or participation by the Defendants.  The Plaintiff argues that it plausibly alleged participation in the Amended Complaint by stating that the Defendants assisted in the negotiations of the sale-leaseback transactions, pressured for the unlawful completion of the transaction, attended the closing, and absconded with the proceeds.  Consolidated Opp'n. at 20 (citing Am. Compl ¶¶ 71–74, 75–83).  Such allegations, as already noted, are vague and lack specificity with regard to the Defendants, except for executives of Defendants Mizuho Bank and Nomura who allegedly sought information regarding the transaction and expressed interest in executing the closing promptly.

Nor does the Amended Complaint show damages suffered by the Plaintiff as result of the alleged breach.  The creditors that the Plaintiff represents were not entitled to the proceeds of the sale-leaseback, and so the fact that the Oil Rigs were sold for less than their appraised value caused no direct harm to the Plaintiff.  The Amended Complaint also fails with respect to the second and third elements of the aiding and abetting breach of fiduciary duty claim under New York law.

Accordingly, the Court will dismiss the aiding and abetting breach of fiduciary duty claim as against the Defendants for failure to state a claim under Rule 12(b)(6).

## IV. CONCLUSION

The Motions to Dismiss are granted.  With respect to each Amended Complaint, counsel for the Defendants shall submit a proposed form of order to the Court consistent with this decision.

Counsel for the Plaintiff must be given the opportunity to comment on each proposed form of order before they are submitted to the Court.

Dated: February 6, 2024
      New York, New York

                                                */s/ Lisa G. Beckerman*
                                                **THE HONORABLE LISA G. BECKERMAN**
                                                **UNITED STATES BANKRUPTCY JUDGE**